[Crim. No. 190.    Third Appellate District.—October 22, 1912.]

THE PEOPLE, Respondent, v. HARRY ASHLAND, Appellant.

$128 \ Pac.798$

CRIMINAL LAW—MURDER—CONFESSION OF WIFE'S ADULTERY WITH DECEASED—HOMICIDE AFTER LONG INTERVAL OF TIME—INSTRUCTION AS TO MANSLAUGHTER PROPERLY REFUSED.—Upon the prosecution of a husband for the killing of the deceased for having committed adultery with his wife, where it is shown that the homicide was committed about seventeen hours after the husband had been told by his wife of such adulterous relation, and the evidence conclusively shows that unless the defendant was at the time of the shooting so far mentally deranged as to be without appreciation of the nature of his act, he was not entitled to an instruction upon the subject of manslaughter. The jury were warranted in convicting the defendant of murder, if they were sufficiently convinced that he committed any crime at all.

KILLING IN HEAT OF PASSION ESSENTIAL TO MANSLAUGHTER—CONCLUSIVENESS TO CONTRARY FROM LONG LAPSE OF TIME.—While the taking of life in the heat of passion will make the crime manslaughter, it will be conclusively inferred that the homicide was not committed in the heat of passion, from the fact of the intervention of a long period of time between the provocation and the act of killing, in which there was sufficient cooling time from the heat of passion. In such case, the act of killing, although prompted by the provocation, will be deemed to have been the result of deliberate premeditation or predetermination to take life.

ID.—INSTRUCTIONS MUST APPLY TO FACTS PROVED.—Instructions must be applicable to the facts; and it is not error to refuse instructions which have no application to the facts as proved. There being no evidence which would give plausible color to the theory that the killing was in the heat of passion, the court properly refused to give any instruction on the subject of manslaughter.

ID.—STATUTORY DEFINITION OF DEGREES OF MURDER—USE OF WORD "OBSERVE."—Where the court correctly gave in the language of the Penal Code, the distinction between the two degrees of murder, the use of the word "observe," in connection with the statutory definition of murder in the first degree, carried with it no erroneous or harmful use of that word, which is in effect that the jury would "take notice" that certain elements stated constituted murder in the first degree.

ID.—REQUESTED INSTRUCTION—DEFENSES UNDER PLEA OF NOT GUILTY—MODIFICATION—ABSENCE OF PREJUDICE.—The court did not err in modifying a requested instruction as to defenses permissible under a plea of not guilty of the offense charged, by striking out certain

unnecessary exceptions stated, where the instruction as modified, in connection with another instruction given, entitled the jury under such plea, to consider all matters of fact tending to establish any defense. But, as insanity was the only defense made, the defendant could not be prejudiced by the modification.

ID.—PROPER DISALLOWANCE OF REQUESTS COVERED BY CHARGE—REASONABLE DOUBT—PRESUMPTION OF INNOCENCE—RIGHT TO REFUSE TO TESTIFY.—The disallowance of requested instructions as to reasonable doubt, as to the presumption of innocence, and as to the defendant's right to refuse to testify, was not prejudicially erroneous, where the court in its own charge, fully covered the law applicable to each of those subjects.

ID.—DEFENSE OF INSANITY—ERRONEOUS REQUEST—INABILITY TO KNOW NATURE OF ACT.—The court properly refused a requested instruction that "to constitute unsoundness of mind, it is not necessary that the person of unsound mind has a delusion or mania, and acts upon such delusion or mania. If you believe from the evidence in this case that, at the time of the killing charged in the information, the defendant was of unsound mind by reason of any delusion or mania, then it is your duty to acquit the defendant." Such request omits the most essential element of insanity as a defense to crime, that the defendant was then so mentally deranged, that he did not and could not know the nature and quality of his act in slaying the deceased, and its wrongfulness.

ID.—PROOF OF INSANITY—PREPONDERANCE OF EVIDENCE—PROPER MODIFICATION OF REQUEST—STRIKING OUT WORD.—A requested instruction that "while the law compels the prosecution to prove the guilt of the defendant of the crime charged beyond a reasonable doubt, and to a moral certainty, the law only requires the defendant, whose insanity is one of his defenses to prove his insanity at the time of the commission of the offense charged by a preponderance of evidence merely," the request was properly modified by striking out the word "merely."

ID.—HYPOTHETICAL INSTRUCTION PROPERLY REFUSED.—A hypothetical instruction purporting to recapitulate the testimony addressed to the defense of insanity and concluding with the statement that if the jury believed that the preponderance of the evidence upon that question showed that the defendant, by reason of the facts set forth, was mentally so deranged at the time he committed the act of killing that he did not know the nature or quality of the act he was doing, or that he did not know that he was doing wrong, a verdict of acquittal should follow, was properly disallowed, as apt to be misleading.

ID.—ABSENCE OF PREJUDICIAL ERROR—FAIR TRIAL—SUPPORT OF VERDICT. It is held that no prejudicial error appears in the record; that the

defendant has been accorded a fair trial, and that his conviction of the offense charged cannot be disturbed upon appeal.

APPEAL from a judgment of the Superior Court of San Joaquin County and from on order denying a new trial. C. W. Norton, Judge.

The facts are stated in the opinion of the court.

R. L. Beardslee, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant, by an information filed in the superior court in and for San Joaquin County, was charged with the crime of murder.

The jury found him guilty of murder of the first degree and fixed the punishment at imprisonment in the state prison for the term of his natural life. (Pen. Code, sec. 190.)

This appeal is from the judgment and the order denying the defendant a new trial.

No claim is made that the evidence does not support the verdict, but the contention is that the court committed a number of prejudicial errors in the matter of giving, refusing, and modifying certain instructions.

The facts and circumstances leading to and attending the commission of the homicide are undisputed, and are substantially as follows: The defendant was a married man, whose family consisted of his wife, aged 24 years, and four children, aged respectively, six, four, and two years and the youngest eight months. With his wife and family he came to California from Philadelphia in the year 1909, and a short time after his arrival in this state he purchased a twenty acre tract of land near a place called and known as Avena, in San Joaquin County. With his family he settled on this land. He owed something like six hundred dollars on the purchase price of the property and, after trying his hand at farming, he found that he was thus making no headway in the reduction of his indebtedness, and, therefore, in the month of June, 1911, went to San Francisco to seek employment, leaving his wife and children on the farm. He remained in and about San Fran-

cisco, making in the mean time one visit to his home, until about the thirtieth day of December, 1911, on which date he received a letter from his wife containing, among other things, the following: ". . . Well, dear, there is a lot of news around here and they are all concerning me. I got myself in all kinds of trouble. Well, I shall tell you when you come home, and then I guess you will get a divorce from me all right. Well I will take my medicine for my foolishness. I am sorry, but I can't do any more than that. I don't really understand myself; it is not like me at all. I will not ask forgiveness from you. You can judge for yourself when you hear it. Please write soon and tell me when you will come home. . . . I do wish I could see you and speak to you. I feel so miserable.''

Upon reading the letter, Ashland immediately left San Francisco for his home, reaching the latter place at about midnight of the day on which he received and read said letter. His wife then told him that one John Gofield (the deceased) who had for some time been in the community where the Ashlands resided serving in the capacity of a United States squirrel inspector, had had sexual intercourse with her on two different occasions—the first time on the eighteenth day of December, 1911, and the second time a few days thereafter, or about Christmas day, and only a few days prior to the receipt by the defendant of the letter above referred to. She declared to her husband that the first sexual act with Gofield was forced upon her by threats and violence upon the part of the former; and that on both occasions the acts were committed on a cot situated in a bedroom in the defendant's house and where the children of the defendant were sleeping on both occasions.

It was about two o'clock in the morning when Mrs. Ashland finished detailing the story of the conduct of Gofield toward her. The defendant thereupon left his house and went to the house of a Mr. Gannon, a neighbor residing a distance of about half a mile from the defendant's home. He awoke Gannon and said that he desired to talk with him. Gannon opened the door and allowed the defendant to enter, whereupon the latter inquired whether there was a "squirrel man" boarding at his (Gannon's) house. Gannon replied that there were two "squirrel men" who had boarded with him, but that they had

left his home some time prior to that day. Gannon, at the request of the defendant, described the men, and the defendant recognized the deceasd as one of the two so described, and declared that he was the man he was looking for. Gannon asked him his reason for seeking Gofield and the defendant excitedly and in a loud tone of voice replied: "He raped my wife! He raped my wife! twice, two different times, four days apart." He then asked Gannon whether he was telling him the truth when he said that the deceased was not in his (Gannon's) house at that time. Gannon assured the defendant that Gofield had gone to his home in Stockton and allowed him to go into the bedroom to assure himself that the deceased was not then in any of the rooms. Gannon then advised the defendant to go to the sheriff and explain his trouble to that official. The defendant, tapping his breast, replied: "If I find him before the sheriff finds him the sheriff will have to do with me and not with him. California is not big enough to hide him."

The defendant then returned to his home, reaching there after two o'clock in the morning. At the hour of nine o'clock, he went to the home of a Mr. Relph, another neighbor, whose home is situated about half a mile from that of the defendant. He excitedly told Mr. Relph the story of the disgrace of himself and children by the conduct of his wife, and shortly thereafter returned to his home. At about eleven o'clock on the morning of the same day (Dec. 31, 1911), the defendant took the train at Avena, about half a mile distant from his house, and went to the city of Stockton. Arriving at Stockton, he immediately proceeded to make inquiries as to the location of the residence of Gofield and asked several persons whether they had seen him lately and where. Eventually he was given information as to the street and block in which Gofield's residence was situated and he immediately repaired to that neighborhood. This was about five o'clock p. m. He inquired of several persons whether they could point out to him the house of the deceased. It happened that a young son of the deceased overheard the defendant inquiring for Gofield and he thereupon volunteered to take the defendant to his father's house. The lad, upon reaching the house, followed closely by Ashland, opened the door and stepped inside, closing the door as he did so, but the defendant immediately

opened the door and stepped into the hallway. The boy told his father that there was a man on the outside who desired to see him. The deceased, who was sitting at this time, arose and put on his coat and went into the hallway, meeting Ashland. The former asked Gofield if he was the "squirrel man," and the latter answered affirmatively. Thereupon Ashland took Gofield by the arm and together they walked out on the porch. After reaching the porch, Ashland asked the deceased if his name was Gofield, and the latter replied that it was. Ashland then said, "You talked to my wife," and the deceased replied, "Do you know who you are talking to?" Again Ashland said, "You talked to my wife," and at the same time fired a shot.

Mrs. Gofield, wife of the deceased, was at her husband's side when the fatal shots were fired. In her language may best be told what occurred following the first shot: "My husband kind of sank back and over again, and I was over my husband, and this man Ashland lowered the revolver and put it between my arm and side and shot my husband in the back, and I was down over him. . . . My husband turned and ran in the house and I turned to go, too, and Ashland ran between myself and husband. . . . My husband was running in the house, and I started to follow and just as we got in the hall we met my husband's mother—she was living with us—and she caught my husband and they both staggered back into the dinning room, and he sank on the floor."

Gofield died shortly thereafter, not having uttered a word after being shot.

After the shooting Ashland fled from the house and was followed by Gofield's father-in-law, who was at the former's house when the shooting occurred, and by one F. J. Murray, a policeman, living near by, who had heard the shots and hastened to Gofield's house to learn the cause and the result of the shooting. Ashland ran down several streets, followed by Murray, who ordered him to stop and fired several shots in the air for the purpose of thus stopping him. Ashland, however, kept on running until he reached the office of the chief of police, located in the court house, into which he ran and there surrendered himself to the chief. The defendant was in a high state of excitement when he reached the police office and upon entering said that he was looking for the chief.

The latter, who was standing in the office, told Ashland that he was the chief, and the defendant excitedly threw his arms about the officer, exclaiming that he had shot the "squirrel man," Johnnie Gofield, and explained that he did the act because Gofield had ruined his wife and broken up his home. He delivered the weapon with which he did the shooting to the chief, and for some time thereafter was in an exceedingly nervous and somewhat hysterical condition, crying and moaning and otherwise acquitting himself as one keyed up to a highly nervous state. A physician was called in and treated the defendant and finally restored him to comparative tranquility.

The foregoing statement embraces the principal and most important facts brought out at the trial, and, as stated, stand in the record uncontradicted.

The defense set up at the trial was that of insanity, the claim and the theory being that the defendant's mind was so wrought upon by the revelations of his wife's unfaithfulness that it gave way to that degree that he was legally not responsible for his act in killing Gofield.

As stated, the objections urged against the judgment of conviction are founded entirely on what counsel for the defendant conceive to be errors seriously prejudicing the rights of the accused growing out of the instructions as given, refused, and modified by the court.

1. First among these assignments of errors is the criticism of the action of the court in refusing to give the instructions upon manslaughter requested by the defendant and thus restricting the jury to the consideration of the question whether the defendant, under the evidence, was guilty of murder of the first degree or of no crime whatsoever. It is vigorously contended that the defendant was not only entitled to have the jury enlightened by the court upon the elements constituting the crime of manslaughter, but that he was furthermore entitled to an instruction stating that that offense is included within the crime charged by the information and that it was within the legal province of the jury, under the evidence, to find him guilty of the lesser offense, if they were convinced beyond a reasonable doubt that he was guilty thereof and entertained a reasonable doubt of his guilt of

either of the degrees of murder.  We cannot assent to this
contention.

The court was perfectly justified, under the evidence, in
limiting the jury to the return of a verdict of murder of the
first degree, if they were sufficiently convinced that the defend-
ant committed any crime at all.

The evidence conclusively established the fact that, unless
Ashland was, at the moment he killed Gofield, insane to a
degree that he was without intelligent volition or was mentally
deranged to an extent that he could not appreciate or know
the nature and quality and wrongfulness of his act in killing
Gofield, such act was most unquestionably preceded by and
the result of deliberate premeditation, and therefore consti-
tuted murder.

To have reduced the defendant's act in killing Gofield from
the grade of murder to that of manslaughter, it must have
been made to appear that the homicide was committed upon
a sudden quarrel or heat of passion.  Obviously, under the
evidence, the act was not perpetrated upon a sudden quarrel
within the legal import of that phrase as used in connection
with the law of homicide.  Nor can it be said that it was com-
mitted in that ''heat of passion'' which will reduce an unlaw-
ful or felonious homicide from murder to manslaughter, for
the act of killing did not take place while the deceased was
actually engaged in having sexual relations with the wife of
the defendant, but was committed some seventeen hours after
the defendant had been told by his wife that Gofield had had
such relations with her.  Undoubtedly he became very angry
and perhaps much beside himself upon receiving this informa-
tion and undoubtedly he remained in a high state of anger
up to the time that he gratified his resentment of Gofield's
acts by killing him.  And it is very probable that, had he not
met the deceased after hearing of his wife's infidelity, he
would for many years thereafter and perhaps for the re-
mainder of his life have been aroused to a state of intense
passion whenever the acts of Gofield recurred to him; yet,
no one would say that he could avenge the wrong committed
against him by Gofield by killing the latter at any time he
might happen to meet him after learning of such wrong and
after the lapse of plenty of time for his passion to give way
to the normal tranquility of his judgment and that the kill-

ing under such circumstances would be deemed to be the result of that "heat of passion" which prevents felonious homicide from transcending the grade of manslaughter. The law expects and, indeed, demands that a person sufficiently wronged by another to arouse in him that "heat of passion" which, if life were taken immediately upon the happening of the provocation, would make the crime manslaughter, shall, if he does not slay him who is guilty of the provocation at the instant it is given, permit his passion, thus aroused, to subside, and where in such case sufficient "cooling time" intervenes between the act of provocation by the deceased and the act of killing by the defendant the latter act, although prompted by the provocation, will be deemed to have been the result of deliberate premeditation or predetermination to take life. If Ashland was in possession of his reason so as to be responsible for his act, ample time had elapsed for his passion to subside—that heat of passion which will reduce unlawful homicide from murder to manslaughter—between the time at which he received the confession of his wife and the time when, after persistent and relentless search for Gofield and the making of threats against his life, he found and slew him.

Under these circumstances, while the fact that the defendant had been told and believed that the deceased had had sexual relations with his wife might tend to support the theory that he had, by reason thereof, temporarily lost his reason or had been so affected thereby as that his power of realizing and knowing the wrongfulness of his act at the time of its commission was destroyed, yet, if his knowledge of the wrong that Gofield had perpetrated against his marital rights had no greater or further effect than to arouse his passion, such knowledge would neither excuse his act nor reduce the homicide, committed some seventeen hours after obtaining that knowledge, to the grade of manslaughter; or, as this precise proposition is stated in the case of the *People* v. *Hurtado,* 63 Cal. 288, 296, "it could not tend to neutralize the effect of the circumstances which tended to establish that the killing was done with the express malice or predetermination to take life which constitutes murder of the first degree." Or, as is said in *People* v. *Arnold,* 116 Cal. 686, [48 Pac. 803] : "While 'the sight of adultery committed

by his wife' may be, as suggested by Mr. Rice (3 Rice's Evidence, sec. 475), provocation to the husband which will justify that 'heat of passion' which is sufficient to reduce murder to manslaughter, the knowledge of such fact must be . . . so recent as to preclude the idea of cooling time or premeditation.''

The case of *Territory* v. *Halliday,* 5 Utah, 467, [17 Pac. 118], is very similar to the present case with regard to the facts. In Utah, at the time that that case arose, among the acts prescribed by law justifying homicide was where the act of killing was committed in a sudden heat of passion caused by an attempt to defile a female relation of the defendant, or when the defilement had been actually committed. The evidence disclosed that the defendant was informed on Saturday, while away from home, of the adultery, and Sunday evening following he went around to the house of the deceased, a considerable distance, and, without any provocation at the time, shot the deceased while the latter was in bed, killing him. The supreme court of Utah held the killing to have been unjustifiable, saying ''The provision of law quoted justifies a homicide committed by the husband in a sudden heat of passion caused by the attempt of the man slain to defile his wife, or caused by her defilement. But the killing must be without deliberation after knowledge of the fact. The law will not permit the husband to say that he slew the defiler of his wife in a sudden heat of passion after deliberating upon the defilement for 24 hours.'' (See 2 Bishop on Criminal Law, 2d ed., sec. 708.)

In this state the killing of a human being in heat of passion does not constitute justifiable homicide, but merely has the effect of reducing the crime to manslaughter, and no particular cause for such heat of passion is expressly prescribed by our law. The principle, however, stated and applied in the Utah case is applicable to our law of homicide, and simply means, as we have shown, that, while the taking of life in the heat of passion will make the crime manslaughter, it will be conclusively inferred that the homicide was not committed in the heat of passion from the fact of the intervention of a long period of time between the provocation and the act of killing. In other words, as is said by the Utah court in the Halliday case, the law will not permit the defend-

ant to deliberate upon his wrong and, avenging it by killing the wrongdoer, set up the plea that his act was committed in the heat of passion.

There being, then, not the slightest element developed by the evidence which would give plausible color to the theory that the killing was committed in the heat of passion in the sense of that phrase as it is used in our law upon homicide, or under such circumstances as to make the crime manslaughter, the court, as before declared, was right in refusing to define the crime of manslaughter or to tell the jury that, under the evidence, the accused might properly be found guilty of manslaughter. Instructions must be applicable to the facts and it is not error to refuse instructions which have no application to the facts as proved. (*People* v. *Carroll, ante*, p. 41, [128 Pac. 4]; *People* v. *Turley*, 50 Cal. 469; *People* v. *Chavez*, 103 Cal. 408, [37 Pac. 389]; *People* v. *Chaves*, 122 Cal. 140, [54 Pac. 596].)

2. Counsel makes the further complaint that the court in effect declared to the jury that the defendant was guilty of first degree murder in the following statement made by the court after defining, in the language of the Penal Code, the two degrees of murder: "From the foregoing provisions which I have read to you from the statutory law of this state, you will *observe* that a murder perpetrated by lying in wait, or by any other kind of willful, deliberate and premeditated killing, is murder of the first degree." The specific criticism of the foregoing language is directed against the word "observe," which, counsel seems to imagine, took on some such sinister or subtle meaning in the connection in which it was therein used as to have necessarily carried with it and thus to the jury a declaration by the court that the evidence established the defendant's guilt of murder of the first degree. But we are unable to discover an erroneous or a harmful use of the word in the connection in which it was there employed. The court thus simply in effect said to the jury that they would "take notice" or "understand" from the provisions of the code read to them that certain elements constituted murder of the first degree, and in so doing made no misstatement or said nothing that it had no legal right to say.

3. The defendant requested the court to give the following instruction: "I charge you that, when a defendant in a

criminal case has pleaded not guilty to the charge contained in the information, he is entitled to give in evidence all matters of fact tending to establish *a defense, except former conviction or acquittal of the offense charged or once in jeopardy, and among other defenses allowed to him is* the defense of insanity.'' The court modified said instruction by striking out the words italicised and, as so modified, read it to the jury. It is contended by the defendant that the effect of the modification of the instruction as indicated was virtually to tell the jury that the plea of not guilty entitled the defendant to establish the defense of insanity *only.* We do not so understand the instruction and cannot conceive that it found its way to the minds of the jurors as counsel construes it. We perceive nothing in the language of the instruction as it was given by the court which limited the right of the defendant to a consideration by the jury of any defense which the evidence might have developed. The truth is that insanity was the only defense made by the defendant and if his construction of the instruction were correct, the act of the court in giving it in the modified form would, under the circumstances, be without prejudice to the defendant. Moreover, the court elsewhere in its charge told the jury that the defendant's plea of not guilty put in issue every allegation of the information and charge, and that under that plea ''all matters of fact tending to establish *a defense* may be given in evidence.'' Thus the court very plainly instructed the jury that *any* defense might be established under a plea of not guilty.

4. It is next objected that the court erred by its disallowance of the following instruction, requested by the defendant: ''The jury are instructed that mere probabilities are not sufficient to warrant a conviction, nor is it sufficient that the greater weight or preponderance of evidence supports the allegations of the information; nor is it sufficient that upon the doctrine of chances it is more probable that the defendant is guilty. To warrant a conviction of the defendant he must be proved to be guilty beyond reasonable doubt and that there is no reasonable theory upon which he can be innocent when all the evidence in the case is considered together.'' The foregoing instruction, which is frequently given in criminal cases, is only a somewhat amplified form of explaining

the rule of reasonable doubt, which must be applied in criminal cases. In other words, the proposed instruction merely contains a statement of certain conditions which may arise from the evidence and thus find lodgment in the minds of the jurors which do not measure up to that degree of proof justifying a conviction. But it was unnecessary to allow and read it to the jury, since in its charge the court explained the meaning of "reasonable doubt" in the language of Judge Shaw in the Webster case, and clearly instructed the jury that the defendant could not be legally convicted upon suspicions suggested by any questions propounded by counsel to the witnesses or otherwise arising, but that his guilt must be determined upon the evidence and by a fair and impartial consideration thereof; that the jury were not at liberty to go outside of the evidence in determining the question of the guilt or innocence of the accused; that the defendant could not justly be convicted except by evidence proving his guilt to a moral certainty and beyond all reasonable doubt, and that in case of a reasonable doubt of his guilt he must be acquitted; that the presumption of innocence was with the defendant during the entire trial and until a verdict of guilty was arrived at; that a preponderance of the evidence was not sufficient to justify a conviction. Thus it will be observed that the court, in its charge, fully covered the principle stated in the rejected instruction. The case of the *People* v. *Murphy*, 146 Cal. 502, [80 Pac. 709], does not hold that said instruction should be given in a case where, as here, the law involved therein is elsewhere stated in the charge of the court to the jury.

5. The propositions enunciated in instruction "B," submitted by the defendant and disallowed by the court, involved the rules as to the presumption of innocence and the privilege of the defendant to refuse to testify, if he so elected, without jeopardizing his legal rights. Both these propositions were clearly explained to the jury by the court and the rejection of said instruction was, therefore, not improper or erroneous.

6. The act of the court in refusing to allow instruction No. 49, proposed by the defendant, is assigned as prejudicial error. Said instruction reads: "To constitute unsoundness of mind, it is not necessary that the person of unsound mind be a raving maniac—it is sufficient if a person of unsound

mind has a delusion or mania and acts upon such delusion or mania. If you believe from the evidence in this case that, at the time of the killing charged in the information, the defendant was of unsound mind by reason of any such delusion or mania, then it is your duty to, and you must, acquit the defendant." The instruction omits the most important element of the law applicable to insanity as a defense to crime, viz.: That the defendant, at the time he committed the act, was so mentally deranged that he did not and could not know the nature and quality of his act in slaying the deceased and its wrongfulness. (*People* v. *Hubert,* 119 Cal. 216, [63 Am. St. Rep. 72, 51 Pac. 329]; *People* v. *Barthleman,* 120 Cal. 11, [52 Pac. 112].) A person may in a sense or to some degree be of unsound mind or he may be laboring under some delusion or be a monomaniac upon some subject, and still be fully capable of appreciating and knowing the nature and quality and wrongfulness of the act of wantonly taking human life. The instruction falls far short of embracing a correct statement of the law upon the subject to which it relates and the court properly disallowed it.

7. It is next insisted that the modification of the following instruction by striking out the word "merely" at the end thereof and reading it to the jury in its modified form constituted error prejudicial to the rights of the defendant: "While the law insists and compels the prosecution to prove the guilt of a defendant of the crime charged beyond a reasonable doubt and to a moral certainty, the law only requires the defendant, whose insanity is one of his defenses, to prove his insanity at the time of the commission of the offense with which he is charged by a preponderance of evidence *merely.*" The instruction in the form in which the court submitted it to the jury accurately stated the rule as to the degree of the burden cast upon the defendant in the proof of insanity as a defense to crime. The addition of the word "merely" could have added no force to the statement of the rule, nor did its elimination from the instruction detract from or impair the force thereof. The law upon that subject is precisely as the court declared it to be and there is no case which holds that the word "merely," as used in the instruction in the form in which it was requested by the defendant, or any other word of like import, is essential to a correct statement

of the rule. Indeed, the animadversion upon the action of the court in striking the word from the instruction is extremely hypercritical.

8. It is lastly contended that the substantial rights of the defendant were grievously invaded by the course of the court in rejecting a lengthy hypothetical instruction purporting to recapitulate the testimony addressed to the theory or defense of insanity and concluding with the statement that if the jury believed that the preponderance of the evidence upon that question showed that the defendant, by reason of the facts set forth in said instruction, was mentally so deranged at the time he committed the act of killing that "he did not know the nature or the quality of the act he was doing or that he did not know that he was doing what was wrong," a verdict of acquittal should follow. We think the court very properly disallowed the instruction. It was based upon a hypothetical question propounded to and answered by a physician and contains, in addition to the fact of the confession to him by his wife of her relations with the deceased, a statement of some of the acts of the defendant with regard to his frugal mode of living for a long time prior to the homicide in order to enable him the better to support his family and pay his debts which facts, in themselves, would have no tendency to prove that degree of insanity which renders one altogether irresponsible for his acts and conduct, and which could only be regarded as important in the proof of any degree of insanity, where they were connected with proof of circumstances more potently pointing to insanity. Under the plea of insanity, the defendant's economical mode of living for the purpose of supporting his family and paying for his home—economical, it appears, to the sacrifice of personal conveniences and comfort—was, of course, properly receivable in evidence as tending to show his attachment for and devotion to his wife and children and thus tending to disclose the keenness of his resentment against the conduct of the deceased with his wife, and, therefore, the probable effect of the latter's story upon his mind; but to have emphasized these particular facts to the jury by rehearsing them in an instruction and saying in connection therewith that if the jury believed therefrom and that by reason thereof the defendant was insane to the degree of irresponsibility when

he killed Gofield might have been construed by the jury, as must generally be true where hypothetical instructions contain the substance of the evidence addressed to a particular theory of a criminal case, as an expression of an opinion by the court that, as a matter of fact, the defendant had become insane by reason of such acts and facts, and that, as a consequence, his mental condition was such, when he committed the homicide, that he did not know or realize the nature, quality, and wrongfulness of his act.

The danger in giving such instructions is obvious. Unless the facts directed to the theory upon which the instruction is founded are accurately stated, or in case the language of the instruction is not sufficiently explicit to show that it merely proceeds upon the assumption that the facts therein stated must be proven satisfactorily to the jury themselves, it is apt to be misleading and to produce mischief rather than promote justice or to bring about a proper consideration of the case and a just result. The better practice is as was adopted by the court in this case, viz.: to state the law fully and lucidly upon the subject of the defendant's defense, and let the jury apply it to the evidence disclosing all the facts tending to establish such defense. The evidence received for the purpose of showing the mental condition of the defendant was not complicated—to the contrary, it involved a plain recital of the defendant's mode of living up to the time of the homicide and of the confession to him by his wife of her infidelity. These facts were all that were shown to establish the defense of insanity and the jury, presumably men of average intelligence, could not have failed, under the clear instructions of the court upon that defense, to have given these facts just and intelligent consideration.

Counsel interposes a general complaint that the terms "murder" and "murder of the first degree" were used so frequently throughout the court's charge that the jury must have inferred that the court was of the opinion that the evidence disclosed the defendant's guilt of the crime charged. There is no merit to this complaint. The important questions presented by the evidence were the crime as charged and the defense of insanity submitted by the defendant, and there was little else of importance upon which it was proper for the court in its charge to address the jury as to the law

of the case. We cannot see that the court used the terms referred to oftener than was necessary, and nowhere were they so used as to indicate that the court had any opinion one way or the other upon the effect of the evidence.

The defendant seems to have been accorded a perfectly fair trial, and, finding no prejudicial error in the record, the judgment and order are affirmed.

Chipman, P. J., and Burnett, J., concurred.