[Crim. No. 9265.   Second Dist., Div. Three.   Sept. 3, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. DAVID
SMITH, Defendant and Appellant.

Stanley L. Avery, under appointment by the District
Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, As-
sistant Attorney General, and Mario A. Roberti, Deputy At-
torney General, for Plaintiff and Respondent.

SHINN, P. J.—Accused of shooting his wife to death, David
Smith was convicted of murder of the first degree in a trial
to the court and sentenced to life imprisonment. The only

question presented on this appeal is the sufficiency of the evidence to support the judgment of first degree murder. Defendant contends that the evidence was adequate only as support for a second degree murder conviction, and that this court should exercise the power given to it under section 1181, subdivision 6, of the Penal Code and reduce the crime to murder of the second degree. The case was submitted to the court on the basis of the evidence taken at the preliminary hearing and a psychiatrist's report offered by defendant.

The circumstances of the crime as revealed by the preliminary hearing were: Defendant had been released from jail about December 12, 1962, after serving a 90-day sentence on a gambling charge. He returned to his rented home at 152 East 111th Street and found a note left by his wife, Earnestine, stating that she had moved. Defendant went to the apartment where his wife was staying and asked to be admitted and she refused him admittance. He asked if she wanted him to break in, accused her of leaving her phone off the hook, and only left after she promised to put the phone back on the hook so that he could call her. Defendant then agreed to let her move back into the house at 152 East 111th Street and he moved out, taking most of his clothes with him. Earnestine and her son, Marvin Scott Davis, planned to move into the house and on December 19, 1962, were at the house cleaning it in preparation for moving back. Davis, an eyewitness to the murder, left the house to go to a store. When he returned he saw defendant standing at the closed front door carrying on a conversation through the door with Earnestine. They were arguing over whether defendant should be admitted to make some telephone calls and to retrieve the last bit of his clothing, as he requested. Earnestine refused to admit him, told him he should use the telephone booth and he said he would take the house back if she was going to be like that. Earnestine told Davis to go to the rear of the house and come in through the back door. Davis went around the house; defendant followed him. When Earnestine saw defendant following Davis she closed the rear door. It was a door without glass. Defendant, seeing the door open, rushed at it in an attempt to prevent its being closed; he hit the door with his shoulder, but it had been closed and locked. Davis then stepped to the door, placing himself between defendant and the door. At this point Davis saw a gun in defendant's hand. Defendant ran around to the side of the house, looked

in a window and immediately ran back to the rear door. Earnestine had partially opened the door again and defendant burst it open, entered the room a few feet, turned, shot Earnestine four times and hurried from the house when she fell to the floor. The police were called. Later defendant called the house, talked to the police, and informed them where he could be picked up. When he was arrested, he handed the murder weapon to the arresting officer. Two witnesses heard defendant and Earnestine arguing through the door at the time of the crime, Davis and a Mrs. Shirley Dawley, who was in the house during the entire episode. Defendant and Earnestine had quarreled several times a week previous to this, according to the testimony of decedent's son, who also testified that the quarrels were not particularly vehement. On the day of the crime, according to the testimony of both Mrs. Dawley and Davis, the quarrel was not particularly bitter and Davis testified that Smith complained to him that Earnestine was "trying to start a whole lot of mess," but did not appear to be extremely angry.

Upon the request of defendant and his attorney, Dr. McGinnis, a psychiatrist, made an examination of defendant and pursuant to stipulation, filed a report with the court. The trial was continued for a week and in the interim the court read the preliminary transcript and the report of the psychiatrist.

The report of Dr. McGinnis was based upon oral and written statements of defendant made during the course of the examination. The effect of the stipulation respecting the doctor's report was that the statements of defendant as related in the report were to be given the same consideration by the court they would have received had defendant made them on the witness stand.

It would serve no useful purpose to relate at length the history of defendant's life with Earnestine as delineated in the doctor's report. Defendant was married first when he was 22 years of age to a woman of the same age. He lived with his first wife until 1957. They were divorced in 1958. He engaged in manual labor until he was about 38 years of age although he spent about two years in the armed forces as a cook. When he was 38 years of age he learned how to operate in the "numbers game" and, thereafter, with the exception of brief periods, made his living through his gambling activities, in which he was quite successful. Shortly after he turned to gambling he met Earnestine, who was then employed in

the "numbers racket" and took her as his mistress. They were living in Detroit, and until 1957 defendant continued to live with his wife and maintain Earnestine as his mistress. Earnestine had a son, Davis, by a previous marriage. Defendant came to Los Angeles in 1957. Some three months later Earnestine arrived and joined him. She suddenly left for Detroit, but returned in 1958 after defendant had divorced his wife and planned to marry her. As stated in the report of the psychiatrist, this was "the first of the multiple separations which have shaken the defendant's life since 1957."

Two weeks before the wedding was to take place, Earnestine again suddenly departed for Detroit and again defendant prevailed upon her to return. Through the year 1958 and thereafter, Earnestine, at intervals, and without informing defendant of her intention, would dispose of the household furniture and leave for Detroit to be with former friends, or for Kentucky where her mother resided. Defendant stated: "She had these fits so many times. Each time she takes the best of everything I've got." Among other incidents related by defendant was one in which in the early morning he located his wife in a motel room with a male companion and caused the room to be broken into, as Earnestine and her companion escaped through a window. Defendant also informed the doctor that upon another occasion he found Earnestine in bed with a woman, engaging in homosexual activity.

When defendant went to the house and found Earnestine had left and all the furniture had been removed, he said "Oh, my God, what man can go through what I have, when all I do is try to do good." It appears from the doctor's report that in September 1962, when defendant was sentenced to jail for 90 days for gambling he gave Earnestine $1,200 for her support during his incarceration. When he was released from jail he was without funds and expected that she would be able to supply him with whatever he needed. He asked her what she had done with the $1,200 and received no satisfactory reply. However, she did give him $25. At this time he had resumed in a small way his bookmaking activity. As related to the psychiatrist, Earnestine called by phone; defendant said "What happened?" Earnestine said that she did not wish to talk about it. He said "What have I done now?" "She asked if I had any money and I said I didn't have any money or anything to eat, and about 11 a.m. she came by and honked the horn."

Enough has been related in this vein to prove that much had occurred in the five years preceding the homicide which

preyed upon the mind of defendant and caused him to resent the repeated wrongs which he felt he had suffered. These frequent absences disturbed defendant greatly. The circumstances of numerous separations were related to Dr. McGinnis in much detail and the doctor said in his report: "Each separation was marked by a renewal of correspondence through writing or telephone, by the defendant sending his mistress and later his wife large sums of money, and by her return to him most often when news came that he had acquired new affluence."

The trial judge and the psychiatrist based their conclusions upon the same evidence, namely, the circumstances surrounding the shooting and the history of defendant's experiences with Earnestine, as related to Dr. McGinnis. The factual and medical conclusions of the psychiatrist were the following. "The defendant's alleged action in the incident of December 19, 1963, which saw his wife subsequently die, appears to have come as his reaction to the cumulative stress of the repeated, unexpected incidents of rejection of himself by herself, with the defendant's world in some degree being destroyed temporarily by each of these incidents, which generally saw him unexpectedly displaced from his living quarters through the removal of the furniture, and suddenly denied the support which he seemingly gained through his wife's presence and affection. This neurotic although obese man appears to have experienced a trenchant disturbance in his stream of consciousness as a result of the final act of denial by his wife at the time shortly before she died, and to have acted under the influence of an intolerable cumulative mental strain through a temporary disorganization of personality, with the production of action in the present offense which then was reflex in character, automatic, not governed by conscious control, and without premeditation, intent or malice aforethought. The examiner views the defendant's action in the present alleged offense as that occurring in a dissociative reaction."[1]

In the argument with respect to the degree of the crime and the penalty, the district attorney maintained that the killing was murder of the first degree, for which the death

---

[1]Defendant explained to the psychiatrist his possession of the gun; he had two pistols, usually kept unloaded; he gave them to Earnestine for her protection; she loaded them; he had them in the car, one on the seat, the other beneath the seat; when he left the car he put one gun in his pocket because he did not want to leave it in the car.

penalty was not suggested. Defendant's attorney pleaded that the crime at most was murder of the second degree, in that the evidence did not show "the act having been committed as a result of careful thought and weighing of considerations, carried on coolly and steadily according to a preconceived design." In response to this argument the court stated: "Long course of conduct which apparently had been building up antagonism in the breast of the defendant for a long time prior. There was a course of conduct on the part of the deceased." The court made no further statement of its reasons for finding that the homicide was murder of the first degree.

The factual conclusions of Dr. McGinnis respecting defendant's reaction to Earnestine's conduct were consistent with the court's apparent conclusions that defendant's resentment and antagonism toward Earnestine had been building up for years and that he planned his visit to the house as a showdown in which Earnestine would have to accede to his demands for admittance or suffer the consequence of refusal. No reason was stated in the report of Dr. McGinnis for the opinion he expressed that in arming himself with a loaded pistol defendant had no intention of using it to the injury of his wife. No fact was made known to the trial judge which detracted from the reasonableness of his conclusion that defendant had a preconceived and deliberate intention to shoot his wife to death if she should oppose his entering the house. The fact that Earnestine's refusal to allow defendant to enter the house was the immediate cause of the fatal shooting did not establish absence of premeditation and deliberation. The court could have doubted that defendant would have used the gun if he had been permitted to enter to use the telephone and remove his belongings. But defendant did not anticipate or prepare for a peaceful meeting. He anticipated trouble and prepared himself for it.

Defendant had been rebuffed and frustrated ever since he had left jail. It could have been reasoned that if he had not expected to be refused admittance, as he had recently been refused, he would have had no occasion to carry a gun in his car; he would not have placed the gun in his pocket when he left the car and started toward the house if he had not intended to use it in case he should be denied admittance to the house. With good reason the court could have concluded from the same evidence as that considered by the psychiatrist that over the years defendant had suffered re-

peated wrongs at the hands of Earnestine, had brooded, meditated and deliberated over the same and after his release from jail had decided upon a course of conduct, namely, that he would go to the house in which he would find Earnestine, would demand admittance, and if he should be rejected he would repay her for all the wrongs she had inflicted upon him by shooting her to death, and thus put an end to an intolerable and hopeless relationship.

As a reviewing court we do not have the ordeal of the trial court of weighing the conflicting inferences from circumstantial evidence which shed light upon the thinking, the motives, the purposes and intentions of the perpetrator of a homicide, and of determining whether the act was committed with premeditation and deliberation. We consider only the legal sufficiency of the evidence to support the verdict or judgment. The leading case of *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8], analyzes and develops clearly the distinctions between murder in the first degree and in the second degree. All killing to be murder must be done with malice and an intent to kill, but to be murder of the first degree that intent must have been formed with deliberation and premeditation. Applying the criteria laid down in *Bender* to the instant case it cannot be said that the judge drew unreasonable inferences when he concluded from all the evidence that the appellant had formed an intent to shoot his wife to death after deliberately making up his mind to that course.

The judgment is affirmed.

Ford, J., and Files, J., concurred.