[Crim. No. 9527. Second Dist., Div. Three. June 29, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. VERNIE MONROE HUDGINS, Defendant and Appellant.

Vernie Monroe Hudgins, in pro. per., and Luke McKissack, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Paul N. Wenger, Deputy Attorney General, for Plaintiff and Respondent.

SHINN, J.*—The judgment in this cause was affirmed August 17, 1965. (*People* v. *Hudgins,* 236 Cal.App.2d 578 [46 Cal.Rptr. 199].) Pursuant to judgment and mandate of the Supreme Court of the United States (*Hudgins* v. *California,* 386 U.S. 265 [18 L.Ed.2d 43, 87 S.Ct. 1035]) vacating the judgment and remanding the cause for reconsideration in the light of *Chapman* v. *California* (386 U.S. 18 [17 L.Ed.2d

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

705, 87 S.Ct. 824]) the remittitur was recalled, the cause was recalendared and duly submitted. We re-affirm the judgment for the reasons stated in the following opinion.

In a trial by jury appellant Hudgins was convicted of second degree murder of Edward Simmons and of violation of section 12021 of The Dangerous Weapons' Control Law (Pen. Code, § 12000 et seq.) ; he was acquitted of a charge of burglary, consisting of entering the house of his wife, Betty, with intent to commit murder, and of a charge of assault with a deadly weapon upon Betty. Appellant was accused of having suffered four prior convictions of felony, which he admitted ; he was sentenced for the two offenses of which he was convicted, and appealed from the judgment. We appointed counsel.

The grounds of appeal are (1) the court erred in failing to instruct as requested by appellant upon self-defense and manslaughter (2) the court instructed erroneously in the law of murder of the second degree (3) the court instructed and the prosecutor commented improperly upon the failure of appellant to testify and (4) appellant was improperly sentenced for both offenses of which he was convicted.

On or about April 19, 1962, appellant's wife, Betty, was severely beaten by appellant and was hospitalized from Friday until Monday. In the following week, with appellant in court, Betty obtained an order of the superior court by which appellant was restrained from molesting her and from going into the home. Thereafter appellant phoned his wife several times a day, threatening bodily harm to her and to anyone she had any connection with and saying "I have a tool that will fix you." Appellant was also seen prowling around his wife's house, which she operated as a nursing home for elderly people. Mrs. Hudgins spent the evening of May 12 with Edward Simmons, returning to her home with Simmons about 1 :45 a.m. May 13th. They were let into the house by Mrs. Turner, an attendant, who then returned to her bedroom, next to the kitchen. Mrs. Hudgins and Simmons went to the kitchen where Mrs. Hudgins put water on the stove for coffee; she went upstairs to attend to a patient, leaving Simmons reading a magazine. Soon thereafter appellant crashed through a plate glass window into the living room. Mrs. Turner ran into the hallway and observed that appellant had some object in his hand. Mrs. Hudgins came to a stairway landing and saw Mrs. Turner and appellant standing at the foot of the stairs; appellant asked, "Where is that man?" and charged through Mrs.

Turner's room into the kitchen. No voices from the kitchen were heard, but there came a rumbling noise like furniture being overturned, followed by three shots. Appellant returned to the hallway and demanded that Mrs. Turner tell him where his wife was; Mrs. Turner indicated the upstairs, and left the scene. Appellant ran upstairs and broke into several rooms of patients seeking his wife, and in entering the rooms he injured several of the door jambs. Mrs. Hudgins endeavored to call the police and then locked herself in a bathroom. She came out of the bathroom and met appellant, who waved a small pistol at her and forced her to go with him down into the kitchen. Furniture in the kitchen had been overturned; the body of Simmons lay in the adjoining service porch. Appellant threatened his wife with the gun, pointing it directly at her throat, and said: "See what I did to your boyfriend; that is what I am going to do to you." Mrs. Hudgins persuaded appellant not to kill her and appellant left the house with the gun. Police officers came and took Simmons to a hospital, where he soon expired. When the officers came they found Simmons lying on his side; he had been shot through the head above the ear; directly beneath his head a bullet was lodged in the woodwork; two other bullet holes were found in the wall of the service porch; on the top of Simmon's head was a laceration some four inches in length which went clear through the scalp. Appellant did not testify.

In the morning of May 13th appellant surrendered to the police. He was interviewed by Officers Childers and Collins on the street and in a police car. He made statements to one or the other of the officers in substance as follows: asked where the gun was he said he dropped it in the struggle and it would be found somewhere around the house; scratches on his face and hands were received in the struggle; he said "I guess I really messed up this time"; he asked "Is Eddie going to be all right" and when told Eddie was dead he said "I am sorry. I didn't intend to do anything like that" and when asked whether he intended to kill Betty, he said "Of course not." To the question whether Eddie and his wife had been having affairs appellant gave no answer; when asked whether there was any possible explanation of what he did, he said he could not possibly answer that on the ground it might incriminate him. Appellant was not informed of his right to remain silent and to have the assistance of counsel.

Appellant's counsel, a deputy public defender, requested instructions on self-defense and voluntary manslaughter,

which were refused. Contending it was error to refuse the instructions, appellant refers to *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281]; *People* v. *Modesto,* 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33] and *People* v. *Lewis,* 186 Cal.App. 2d 585 [9 Cal.Rptr. 263] for the proposition that a defendant is entitled to instructions upon any theory of defense having support in the evidence, however weak that evidence may be. This, of course, is a familiar rule, but it does not aid appellant.

To have instructed on self-defense would have suggested to the jury that in the court's opinion it would be reasonable for the jury to find that Simmons attacked appellant and that appellant used only such force as reasonably appeared to be necessary to repel the attack. The reasonable inferences from the physical facts were that appellant attacked Simmons, there was a struggle, appellant fired two shots at Simmons which missed, hit him on the head with the gun, knocked him to the floor, and as he lay on the floor on his side, shot him through the head.

▮ The right of the accused to have the jury instructed upon every theory of his innocence of the crime charged does not extend to a claim of self-defense based upon purely imagined facts or upon inferences that could not be drawn by rational minds. And jurors should not be encouraged to draw unreasonable inferences. The right of the accused is not superior to the right of the People to have the jury properly instructed. ▮ The evidence of the prosecution, and there was none other as to the circumstances of the killing, was such as to preclude an inference, or even a faint suspicion that appellant acted in self-defense. The requested instruction on that unavailable defense was properly refused.

Equally untenable is the contention that the jury should have been instructed in the law of manslaughter. The argument of appellant is stated in the brief as follows: "It is clear from the evidence that the events culminating in the death of Mr. Simmons were the outgrowth of a saturating jealousy infused in the defendant by his wife of over five years standing, and were brought to a head when her male companion brought Mrs. Hudgins home to a sleeping boarding house in the wee hours of the morning of May 13th, 1962. The defendant could contain his jealousy no longer and broke into the house in pursuit of the person he reasonably felt was his wife's paramour. This was a tale as old as life itself."

Some additional facts should be stated. Mrs. Hudgins testi-

fied that when she and appellant married she was operating a boarding house for elderly people. She and appellant had numerous battles. They were separated a short time in April when appellant was away from the home; soon after he returned he assaulted her, knocked her down three times and caused injuries which sent her to the hospital. Appellant was violently jealous of everyone with whom she was associated. In his threats he named Floyd Eddisen, with whom his wife had not gone out, and other persons. A Mrs. Payne, who had worked for Mrs. Hudgins testified for the defense that she had heard Mrs. Hudgins tell appellant that she had had affairs with one Floyd Eddisen and "two or three other different names," that Mrs. Hudgins told her that she had told appellant she had driven down the street picking up men for her entertainment, and that she said she had told her husband these things because he threatened her. Mrs. Hudgins denied having made any of these statements.

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187.) Under the facts of the present case, it would be the killing of a human being with malice if done without considerable provocation, or where the circumstances of the killing showed an abandoned and malignant heart. In either situation malice is implied. (Pen. Code, § 188.) Manslaughter is the unlawful killing of a human being without malice. (Pen. Code, § 192.) Therefore, in order to avoid an implication of malice and make the killing of Simmons manslaughter, rather than murder, it was necessary that facts be shown which would, at least, constitute considerable provocation for the crime.

The provocation urged in the trial, and now asserted, is jealousy—not of anyone in particular, but of all persons with whom appellant's wife was associated. This jealousy led appellant to a violent assault upon his wife, to arming himself, and making threats several times a day, while living away from home, of bodily injury to his wife and to other persons. No reason for this jealousy is found in the record, other than the taunts to which Mrs. Payne testified, which Mrs. Hudgins denied. There was no evidence of misconduct on the part of Mrs. Hudgins. The restraining order did not prevent appellant from threatening his wife. While he did not enter the house until the night of the murder he lurked about and spied upon his wife. On the occasion of the killing he was watching the house after midnight, armed with an automatic pistol, knowing, no doubt, that his wife was away, and prepared to

break into the house upon her return. As stated in appellant's brief (*supra*) "The defendant could contain his jealousy no longer and broke into the house in pursuit of the person he reasonably felt was his wife's paramour." It is contended that the killing under these circumstances could reasonably have been determined to be voluntary manslaughter, or a killing "upon a sudden quarrel or heat of passion." (Pen. Code, § 192.)

An instruction on manslaughter would have effectually informed the jury that, in the opinion of the court, there was evidence upon which they could find that the killing was upon a sudden quarrel or heat of passion. ██ There was no evidence of a sudden quarrel, but only proof of a violent attack by an armed man upon one who was unarmed and who made a futile attempt to save his own life. There was no sudden heat of passion, but only evidence of a persistent, brooding jealousy which spurred appellant to a decision to arm himself and lie in wait for a victim. All the evidence indicated it was not a sudden, impetuous decision, acted upon without time and opportunity for reflection and the cooling off of suddenly aroused emotion. It was a decision reached after long deliberation and meditation, and careful preparation to carry into execution the threats appellant had repeatedly uttered. Upon these facts the killing was not manslaughter; it was, at the least, murder of the second degree. (Pen. Code, § 188.)

The request for an instruction on manslaughter was properly refused. (*People* v. *Sutic*, 41 Cal.2d 483 [261 P.2d 241]; *People* v. *Farrington*, 213 Cal. 459 [2 P.2d 814]; *People* v. *Ashland*, 20 Cal.App. 168 [128 P. 798].)

The court instructed in the law of murder of the first degree and also gave the instruction on second degree murder set out in the margin.[1]

---

[1]"305 MURDER OF THE SECOND DEGREE. If the unlawful killing of a human being is done with malice aforethought, but without deliberation and premeditation, that is, without the wilful, deliberate and premeditated intent to take life which is an essential element of first degree murder, and is not committed in the perpetration or attempt to perpetrate burglary, then the offense is murder in the second degree. In practical application this means that the unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder of the second degree in any of the following cases: (1) When the killing results from any unlawful act, the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another, or (2) When the circumstances attending the killing show an abandoned or malignant heart, or (3) When the killing is done in the perpetration or attempt to perpetrate a felony other than arson, rape, robbery, burglary or mayhem."

The instruction is criticized as an incorrect definition of murder of the second degree since the reference to other felonies would have permitted the jury to find that appellant entered the house with intent to commit a felonious assault upon Simmons, and to determine from that fact that the killing was murder of the second degree. It is argued that the instruction, as thus understood, would have permitted the jury to disregard the circumstances of the homicide, and any evidence of great provocation, or sudden quarrel or heat of passion which might reduce the homicide to manslaughter. It is a plausible argument, as clearly shown by Professor Perkins (Perkins on Criminal Law (1957) p. 36).

■ Although to be technically correct any instruction on the felony-murder rule should have made it clear that an assault upon Simmons contemporaneous with the shooting would not be a felony which would make the killing murder of the second degree, we believe it highly improbable that the lack of clarification would have influenced the thinking of the jury in the slightest. ■ When the actions of appellant are reviewed, his breaking into the house, rushing to the kitchen, striking the blow which knocked Simmons to the floor, firing the shot which killed him, we find all the elements of murder of the first degree established with certainty. The jury treated appellant with leniency in acquitting him of first degree murder. (*People* v. *Gingell,* 211 Cal. 532 [296 P. 70]; *People* v. *Smith,* 229 Cal.App.2d 511 [40 Cal.Rptr. 399].)

· In the discussion which follows we do not assume that any instruction on the felony-murder rule should have been given, but we find it proper to comment on the one that was given. The portion of the instruction which preceded the words "in any of the following cases," followed by the paragraphs numbered 1, 2 and 3, was a good instruction, suitable to be given in any case in which an instruction on second degree murder is required. But the addition of the numbered paragraphs spoiled what would otherwise have been a good instruction by the qualification placed upon the earlier statements and by the errors in the added material.

■ Paragraph 1 is a correct statement of the law but it was out of place in the present case. If there had been a question whether the actions of appellant were "dangerous to life" and were known by him to be dangerous, the instruction would have served a purpose, but submitting that question to the jury when the uncontradicted evidence was that appellant knocked Simmons to the floor and shot him through

the head, was a violation of the fundamental rule that in-. structions should be limited to factual questions presented by the evidence.

■. Paragraph 2 purports to instruct on malice. It was not even a good instruction on malice. It states, in a backhanded way, that a killing is with malice if the circumstances show an abandoned and malignant heart. It fails to state that malice is implied, also, when no considerable provocation for a killing is shown. Paragraph 2 was unnecessary and invited confusion.

■ Paragraph 3 is the most unfortunate of all. It tells the jury that a killing is murder of the second degree (absent deliberation and premeditation) if committed in the perpetration or attempt to perpetrate a felony other than arson, rape, robbery, burglary or mayhem. This is good law, as stated in *People* v. *Ford,* 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892] and numerous other cases. But lifting such general statements from the opinions of reviewing courts at random and using them as instructions, regardless of their suitability for that purpose, evidences the common fault of assuming that every sound, abstract statement of law found in the books is good for an instruction. The error of paragraph 3 is conspicuous. The jury was asked to determine, among other things, whether the killing of Simmons was in the perpetration or attempt to perpetrate a felony, other than those named. What is a felony? What felony did the court have in mind? Does the jury know that a crime is a felony if it is punishable by death or imprisonment in a state prison, and does it know what crimes are punishable in this manner? So much for the inherent error in the instruction.

What possible application could the jury have made of the reference to other felonies? Only confusion would have resulted. Entry of the house with intent to commit murder or an assault upon Mrs. Hudgins would have been burglary, and this was excluded. Another felony would have been the assault upon Mrs. Hudgins with a deadly weapon, but the killing could not have been found to have been committed in the course of the assault upon Mrs. Hudgins, since, when the shooting occurred, Mrs. Hudgins was upstairs and had not been contacted by appellant. Another felony was the blow administered to the head of Simmons, but as previously shown, this could not have been properly regarded as a felony which would invoke the felony-murder doctrine. In another case, under different facts, the instruction could be seriously

prejudicial, but there is not the faintest reason to believe that the error resulted in harm to appellant.

The court gave the standard instruction respecting the significance of the failure of the defendant to testify, and the matter was commented upon by the district attorney. This was error (*Griffin* v. *California*, 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]; *People* v. *Bostick*, 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529]), although it was correct procedure at the time of the trial. The error, however, would not justify a reversal of the judgment. The circumstances of the shooting as described by the witnesses established appellant's guilt of murder to the point of demonstration. Accordingly, we are convinced beyond a reasonable doubt that the giving of the instruction and the comments of the prosecutor upon the failure of the defendant to testify did not influence the jury in the slightest degree and that appellant suffered no prejudice by reason thereof. (*Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

There was no error in the admission of the testimony of Officers Childers and Collins respecting the statements of appellant which resulted in substantial prejudice to him. With appellant in custody, as a result of his voluntary surrender, the officers had no occasion to look further for the slayer of Simmons. There was no course of interrogation which lent itself to eliciting damaging statements, but only casual conversation between the officers and their prisoner on the way to police headquarters. Appellant denied that he intended to kill Simmons. Evidence was received that when appellant was asked whether there was an explanation of what he had done he refused to answer upon the ground that it might incriminate him. When it appeared that appellant was standing on his constitutional right to remain silent it was error to receive evidence of his refusal to answer the question (*People* v. *Ridley*, 63 Cal.2d 671, 676 [47 Cal.Rptr. 796, 408 P.2d 124]), but the error would not furnish a reason for reversing the judgment. In view of the overwhelming evidence of appellant's guilt it appears beyond the faintest doubt that the error was harmless.

As previously stated, appellant was sentenced for second degree murder and for violation of The Dangerous Weapons' Control Law, and it is contended that the two sentences were in violation of section 654 of the Penal Code, and the law as declared in *People* v. *McFarland*, 58 Cal.2d 748 [26 Cal.Rptr. 473, 376 P.2d 449]. This would be true if the two

offenses were committed by one act or in a series of acts having but a single purpose, but such was not the case. The acts constituting the offenses were separable. Possession of the gun constituted one offense, and this was an act separate and apart from any use that was made of the gun, and would have been a completed offense even if no use had been made of it. Appellant was properly sentenced for both offenses.

The judgment is affirmed.

Ford, P. J., and Cobey, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 27, 1967. Peters, J., was of the opinion that the petition should be granted.