[Crim. No. 7096. In Bank. Feb. 4, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM J. FORD, Defendant and Appellant.

Arnold H. Gold, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—Defendant appeals (by operation of Pen. Code, § 1239, subd. (b)) from judgments of death and imprisonment imposed pursuant to jury verdicts finding him guilty of first degree murder, first degree burglary, possession of a concealable weapon by an ex-felon (Pen. Code, § 12021), first degree robbery, assault with a deadly weapon, and two counts of kidnaping.

Defendant advances a variety of contentions relating to the nonhomicide counts, but we have concluded that no prejudicial error occurred in connection with those convictions.[1] As to the murder count, however, the record substantiates defendant's contentions that the court erred in giving improper instructions on intoxication and in failing to give of its own motion the required cautionary instruction as to defendant's alleged oral admissions, and that on the evidence in this case such errors were prejudicial. Accordingly, we reverse the judgment on the murder count to prevent a miscarriage of justice (Cal.Const., art. VI, § 4½).

By information defendant was charged with the burglary of the home of John B. Roope on June 2, 1961 (Count I) ; in the remaining counts, all referring to events occurring on June 9, 1961 (one week after the Roope burglary), defendant was charged with possessing a concealable weapon in violation of Penal Code section 12021 (Count II), robbing Roope of $29 (Count III), kidnaping Roope (Count IV), assaulting Ben Hardy with a deadly weapon (Count V), kidnaping defendant's wife, Emma Ford (Count VI), and murdering David Harvey Stahl (Count VII). A motion to suspend the

---

[1] As hereinafter explained certain findings were erroneously made on each of these counts, but we rectify the error by ordering such findings to be stricken from the judgments.

proceedings pursuant to Penal Code section 1368 (doubt as to sanity for trial) was denied, and defendant entered a plea of not guilty to all counts. An additional plea of not guilty by reason of insanity was withdrawn when the cause was submitted to the jury on the not guilty plea. The jury convicted defendant on each count, finding the burglary, the robbery, and the murder to be of the first degree. By stipulation the question of penalty was submitted to the jury on the evidence received at the trial of the not guilty plea to the charge of murder. The jury fixed the penalty at death, and defendant's motions for new trial or for reduction of the penalty were denied.

Analysis of the record discloses that the evidence relating to the issue of defendant's capacity (as affected by such factors as his seeming intoxication at the time of the homicide) to deliberate and premeditate sufficiently to form an intent to commit, or to so carry out a previously so formed intent to commit, murder in the first degree appears to admit of conflicting inferences. The prosecution's case on this issue as to deliberated and premeditated specific intent (aside from the physical facts, which in the main are undisputed) is based in principal part on various oral admissions or declarations assertedly made by defendant during the course of the events in question, as reported however by seemingly hostile witnesses whose testimony was impeached in several significant respects on cross-examination. Forming a background for the claimed inculpatory evidence is the largely uncontradicted — and in certain material respects corroborated (see, e.g. fns. 2, 4, 5, and 6, *post*) — testimony of defendant as to his wife's confessed and continuing adultery, his knowledge that their children had observed her sexual misconduct, his inability (or perhaps lack of implemented desire) to provide shelter for his family or to secure a job, his deteriorated physical condition caused by malnutrition, lack of sleep, exposure, and ill health, and finally, his consumption of a large amount of alcohol immediately prior to and during the commission of the alleged crimes.[2] In such a case, under the current framework of our substantive and procedural law, we must scrutinize the record with particular care to determine not merely the sufficiency of the evidence to establish that defendant committed the acts charged but also how far it

[2]Defendant's deteriorated physical condition and high consumption of alcohol, and the effects thereof, were also testified to in considerable detail by the court-appointed psychiatrist, Dr. Carleton.

reflects the errors assertedly committed and their probable effect on the fairness of defendant's trial. (*People* v. *Briggs* (1962) 58 Cal.2d 385, 404 [1] - 405 [2] [24 Cal.Rptr. 417, 374 P.2d 257].)

In February 1960 defendant brought his wife Emma and their four children from Illinois to California. Six months later (i.e., in August) he was extradited to Illinois on a bad check charge.[3] This certainly did not help him support his family, or keep them together. However, he was not prosecuted, and after an absence of some five months returned to California on January 10, 1961. He arrived at his home in Atascadero by bus at approximately 2 a.m., and found his wife in an advanced state of pregnancy. She had not previously told him of her condition and said ''she had her own reasons for not letting me know.'' In spite of the hour she kept insisting that he take her out of the house, and finally admitted that she was expecting a visit by one Ole or Ollie Atkins. Atkins arrived a half hour later, and defendant told him that he knew of the affair and that he wanted Atkins to ''stay away and leave my wife alone and not return again to the house.''

Defendant and his wife then agreed to resume a normal marital life. The baby was born prematurely on January 19, 1961, and was put in an incubator. About a week later, having learned that his wife had undertaken arrangements to have the baby adopted by a minister, defendant asked her whether or not he was the father. She confessed that while he was away she had had sexual relations with Atkins and one Frank Nado. It does not appear likely, however, that either Atkins or Nado could have fathered the child *during defendant's absence* (August 1960 to January 1961) in Illinois; there was no evidence that the child, although premature, was or could be of only five month's gestation. Defendant said he forgave her misconduct because he ''wanted to keep the family together.''[4]

A series of illnesses then struck the other children and

---

[3]Defendant had previously been convicted in Illinois on a similar charge, and had served a term therefor in Illinois state prison. That conviction is part of the basis of Count II of the information, charging possession of a concealable weapon by an ex-felon (Pen. Code, § 12021).

[4]Each of the foregoing facts—i.e., the circumstances of defendant's return to Atascadero, Mrs. Ford's concealment of her pregnancy from him, the nocturnal visit of Atkins, Mrs. Ford's confession of illicit sexual relations, and their agreement to forgive and forget — was corroborated in Mrs. Ford's testimony on cross-examination.

Mrs. Ford, and defendant was unable to find a steady job. Defendant, according to his testimony, overheard two men in. a cafe say that "Ole Atkins had had.my wife out and they thought they could go out and get her too." Defendant asked his wife to go with him to tell Atkins again to stay away from her because defendant "was afraid of it getting back to the kids." They drove to Atkins' house in Creston and defendant went in alone. Atkins pulled a pistol out of his pocket and fired at defendant's head, then ordered him out of the house, saying, "if I ever see you downtown, I will have this pistol in my pocket."[5]

Shortly afterwards further family difficulties arose. The oldest son, Billy (about 11 years old at the time of these events), had to be hospitalized; defendant was able to find work for only one or two days a week; the family was evicted for nonpayment of rent; and defendant was arrested for bad checks that his wife had written, then released upon his promise to make restitution. About April 10 most of their furniture was repossessed and they had to move again. They went to live at the house of one Charles Spores (or Porter). While there Mrs. Ford was hospitalized for an operation, and when defendant returned to the house his two young daughters (respectively about 10 and 8 years old at the time) told him that Spores had tried to molest them. Spores denied it and ordered the family out at the point of a rifle. They went to a nearby National Forest, and some slept in the car while others slept on the ground. It was then agreed that defendant and Billy would look for work while Mrs. Ford and the other children would live with a Mrs. Owens. Mrs. Ford returned to the forest that evening and told defendant that Spores had signed a warrant against him for assault with a deadly weapon, and that there were also warrants out against him on bad check charges.

Defendant and Billy travelled around for some days in a fruitless search for work, then returned to the forest outside Atascadero on May 20 and telephoned Mrs. Ford. She met them and refused to take Billy back into town because she had told the school nurse he had gone east with defendant. She agreed to bring them food and money, however, and took the car into town. For two days she brought them small

---

[5]In corroboration of these events Mrs. Ford testified on cross-examination that defendant told her he had been hearing stories about her misconduct, that she and he then drove out to Atkins' house in Creston, that defendant went in alone and unarmed, and that while he was in with Atkins she heard a shot fired.

amounts of food, then she did not return. While they were living in the forest Billy told defendant that he thought Nado or Atkins was the father of the baby because "he had seen them making love with his own eyes."

Defendant's story continues: Four or five days after Mrs. Ford stopped bringing them food Billy walked into town to see what was wrong. He never returned. The next day defendant, weak and hungry, also walked into town, stopping on the way to eat some deer entrails. He telephoned his wife from the train depot and she said she would come and pick him up. He waited all night, but she never came. The next day he telephoned again, and Mrs. Owens told him that his wife was gone and didn't want to see him.

Defendant returned to the forest and spent his nights either sleeping in the river bed or walking around Atascadero trying to find his wife and children. On the morning of May 31 he stopped at the house of John Roope and asked to use the telephone to call his children at their school. He talked to his daughter Beverly, who told him that they had moved back in with Spores. Thereafter, according to defendant's testimony, in the course of a conversation with Roope he asked Roope why the latter was not married; Roope replied that he preferred men, and made an indecent proposal to him for $15; and defendant, who was broke and hungry, submitted to him for the money. Roope denied this on the witness stand. In any event, Roope then drove defendant across town in an effort to locate Mrs. Ford, but she again refused to see him.

A few days later a burglary was committed at Roope's house, some time between 6 p.m. on June 2, when Roope left for work (he was a motion picture projectionist), and 1:15 a.m. on June 3, when he returned. The burglar had gained entry by prying open a front window and cutting the screen. The only item stolen was a .22-caliber revolver and some ammunition, which Roope kept in an empty film box. Although Roope had kept this box hidden in his bedroom, he could not recall exactly where it had been on the night it was stolen. Roope testified that he subsequently ran an advertisement in the local newspaper offering $25 reward for the return of the gun, and for this purpose put five $5.00 bills in his wallet after copying down their serial numbers.

Defendant testified that he spent the evening of June 2— as most of the evenings in the first week of June—trying to find his wife and children. He visited their acquaintances,

walking each night from house to house. On two or three occasions he went to see a friend named Ramon Larious, who mailed letters for him to his wife and sister. He continued to sleep in the river bed, and ate little because he had difficulty keeping food in his stomach.

On the morning of June 9 he telephoned the school to talk with his children, but was informed they had not been there for several days. He then telephoned Spores, gave a false name, and asked if Mrs. Ford was there. Spores replied that she had left about a week before, and gave defendant the telephone number of a residence in Creston where she could be reached. Defendant testified that when he learned she was living in Creston (the town where Atkins lived) he "broke down and was crying and shaking." He bought a small bottle of wine at a grocery, and sat under a bridge and drank it while "trying to think of what to do, who I could get to take me over there to find out what had happened, and where the children were at, and I thought if my wife was over there, I didn't want the children to live under the circumstances they lived under before." Defendant then remembered Roope, went to the latter's house at about 10 a.m., and told him that he was trying to find out if a certain telephone number belonged to Atkins. Roope let him in, and by calling the operator defendant learned that the number in Creston was that of Atkins.[6]

At this point the testimonies of Roope and defendant further diverge. According to Roope, defendant asked for a ride to town; they went outside to feed Roope's horse, then returned when defendant said he would like to use the telephone again. Once inside, defendant asked to use the bathroom, and when he came out he was holding Roope's revolver in his hand. Defendant said, "If you do exactly as I say, I won't shoot," and ordered Roope to lie face down on his bed. Defendant then "asked me if I had any money and to give it to him," and Roope gave him the $5.00 bills from his wallet; defendant also took more ammunition from a box on the shelf, remarking that the gun had five shells in it. Roope said, "So you are the one who broke into the house"; defendant replied, "Yes, I am," and apologized for damaging the window and screen. Defendant then said, "You are a queer, aren't you?" but Roope denied it; defendant looked

[6]In corroboration of this information Mrs. Ford subsequently testified that she had lived at Atkins' house from June 4 to June 9, the day of the events in question.

at some papers in the desk drawer, discovered Roope's name, and apologized.

Defendant's testimony is materially different. He stated that after discovering that his wife was at Atkins' house he told Roope of his marital troubles, and said that "if she would let me have the children, I would take the four older children and go back east and she could stay over there, if she wanted to, but I didn't want the children over there." Roope then offered to take defendant to Creston, but defendant said that he was afraid to go because Atkins had shot at him the last time he was there. Defendant testified that he then "asked him if he had a gun that I could take with me, and he told me that he did have a gun and that — he mentioned a Mexican name that returned a gun from Santa Margarita. I can not remember the name, but he told me that he did return the gun to him. That I could use that gun because the Sheriff can't do anything about it. He had reported it missing and that he also had run an ad in the paper concerning the gun." Roope took the gun from a desk drawer, loaded it, and gave it to defendant. After they fed Roope's horse Roope again made an indecent proposal for $15, and when defendant declined Roope raised the offer to $25. Defendant submitted, took the money (the five $5.00 bills) in payment, and they left in Roope's car, with Roope driving.

They stopped at a nearby grocery store and defendant bought gasoline, cigarettes, and a bottle (inferentially a fifth) of "Triple Jack" (apparently a type of fortified hard cider, of a higher proof than wine). Roope testified that defendant said "he needed the drink to get up his courage." Defendant testified that he bought the liquor because "I was just shaking, so nervous and everything, that I thought it would calm my nerves down some."

From this point onwards the evidence of what transpired is to be found solely in the testimony of the prosecution witnesses. Defendant's explanation (supported to some extent, as will be shown, by the testimony of the court-appointed psychiatrist) is that after drinking from the bottle of "Triple Jack" he recalls only "seeing my son and I recall talking to him. I was looking him in the face and I couldn't call his name until he asked me if you are looking for somebody, daddy, and I said, yes, I am looking for you children and I asked him if Ole Atkins was there and he told me no. I asked him where his mother was and he pointed out to where his mother — and at that time she was coming

toward me." After that, defendant testified, he recalled nothing more until he woke the next day in the drunk tank of the jail.

Roope testified that he (driving) and defendant travelled first in the wrong direction, then turned around and headed towards Creston; and that after a mile or so defendant fired the gun once out of the window, saying "he wanted to see how it shot." Defendant reloaded, and they proceeded to Atkins' house in Creston.

Ben Hardy, the victim of the assault with a deadly weapon, testified that he and Henry Hern were putting oil in an automobile parked in front of Atkins' house when he heard two shots fired close together and felt a sting in his armpit. He looked up and saw defendant fire a third shot straight up in the air. Defendant said "you sons-of-bitches come here," and when they came towards him, said that was "far enough."[7] A medical witness testified that Hardy had suffered two bullet wounds in the shoulder. Henry Hern corroborated Hardy's testimony that defendant fired two shots and then a third straight up in the air.

Roope testified that defendant spoke to Mrs. Ford, sent one of the children to get the baby from the house, then "told his wife and children to get in the back of the car." They complied, except for his son Billy who was left behind. Defendant then took the driver's seat, and as they drove out he stopped the car next to Hardy and asked, "What is the matter fellow, you been hurt?" Hardy replied, "No, you son-of-a-bitch, you shot me." Defendant denied having done so, and drove off.

According to Roope's testimony, defendant drove first through Creston and toward Santa Margarita, where defendant ordered Roope to write out a $20 check and have it cashed. They stopped at a bar, parked outside, and defendant and Roope went in. Defendant ordered a beer while Roope wrote out the check. Identification was requested, and defendant walked back out to the car to get Roope's billfold, leaving

---

[7] It is of interest that at the preliminary examination some five months earlier Hardy had testified as follows:

"Q. Did Mr. Ford appear angry at you on this occasion? A. Well, I don't recall him even saying anything to me, other than 'you fellows come around on the other side.'

"Q. He didn't curse you? A. Not to my knowledge.

"Q. He didn't threaten you verbally? A. Not to my knowledge. I didn't hear him say anything other than 'you fellows come around here.'"

Roope in the bar with three other persons. Apparently Roope made no effort to escape or to secure help during defendant's absence. However, the fact that defendant was in possession of a loaded gun and shortly theretofore had wounded Ben Hardy with it was doubtless fresh in Roope's mind. Defendant returned and after the check was cashed he and Roope (together with defendant's wife and the above mentioned children) drove onto Highway 101 and headed south. Defendant stopped the car beyond San Luis Obispo and told his wife to get out; they went to the back of the car, spoke some words, then she got in the front seat between defendant and Roope and they drove on. At Shell Beach defendant turned off the highway onto a business road and proceeded south, then made a U-turn and went north, then made another U-turn and proceeded south again. In making the latter turn he knocked over a planter in front of a motel. Near Pismo Beach he stopped the car, got out, and urinated. Then he made another U-turn and went north again on the business road. As he passed two parked highway patrol cars defendant asked for Roope's wallet for identification and said, "they'd better not give me any trouble." He then reentered Highway 101, and drove north for a short distance in the southbound lane; while so travelling he tried to cross over the dividing strip and the car became temporarily stuck in some plants; finally he found a paved crossing point and proceeded to the proper lane. Subsequently he turned off the highway into San Luis Obispo, then made another U-turn, returned to Highway 101, and continued north towards Atascadero, where he turned off again and stopped the car. He urinated, reentered the car, had further words with his wife, struck her once or twice, and resumed the journey.

As he drove on in the direction of Creston he passed a sheriff's car parked in an intersection. He told Roope and Mrs. Ford, according to Roope's testimony, to "look straight ahead and make believe we were carrying on a conversation." Apparently the ruse, if it was that, failed. He drove on for two more miles, then pulled over and stopped as the tailing sheriff's car drew up behind him. Defendant got out of the car with the gun in his belt, saying, "that son-of-a-bitch had better not give me any trouble." Defendant and Deputy Sheriff Stahl met in the middle of the road; Officer Stahl told defendant to hand over his gun; defendant refused, they scuffled, and defendant broke away and ran north around the front of Roope's car. Defendant and Stahl

then faced each other with drawn guns across the hood; defendant fired first and the brave officer fell, victim of the so-called peace officer's code. Defendant walked back around the car, pointed his gun downwards and fired again.[8] Defendant then "made a kicking motion and swore," and bent down briefly. He next told his wife and Roope to move the body off to the side of the road, then struck them as they reentered the car. The engine had been left running, and Roope slid behind the wheel and drove away before defendant could get in.

On cross-examination Roope testified that when defendant appeared at his house on the morning of June 9 he was "somewhat excited." By the time they reached Creston defendant had already consumed a quarter or a third of the bottle of "Triple Jack." After leaving Creston defendant drove "very wildly" and at an "excessive rate of speed." After they left the bar in Santa Margarita defendant began driving very erratically: "he would slow down and then he would go fast again; and if a car would pass him, he would immediately speed up and try to pass the car that passed him." When asked to slow down defendant gave no answer and did not seem to hear. At one point "he wanted a cigarette and he asked his wife for the cigarettes, and I believe he had them himself, and then he couldn't light one and I — I am not absolutely positive of this, but he was mad, — he appeared to me to be quite confused as to this cigarette business and lighting it, and he asked his wife to light it." When he knocked over the planter in making a U-turn "he made a remark that gave me the impression that he felt that he was getting even with something by knocking the plant over," something to the effect of "This will teach you." When they passed the two parked highway patrol cars Roope was "quite surprised" that they were not stopped because of the manner in which defendant was driving. As he proceeded north in the southbound lane of Highway 101, oncoming cars blew their horns at him; when Roope and Mrs. Ford told him where he was, he tried to cross over the dividing strip. Thereafter his driving was even more erratic: "If anybody passed him he immediately floorboarded the Plymouth and went just as fast as he could by them, until he got by them and then he would slow down." After turning off into San Luis Obispo defendant "didn't seem to know where he

---

[8]Medical testimony established that Stahl suffered two bullet wounds, one in the neck and a second, fatal one, in the head.

was." He asked how to get back onto the highway, and when Roope and Mrs. Ford told him "he acted as though he didn't believe what we were telling him. He was starting to get rather angry"; Roope "got the impression" that defendant thought they were lying to him.

Considering now the testimony of defendant's wife, Emma Ford, it is first to be noted that defendant interposed a timely objection under Penal Code section 1322 to her being a witness against him without his consent. The court overruled the objection on the ground that defendant was charged with "a crime committed ... against the person ... of" his wife (Pen.Code, § 1322), i.e., kidnaping. That charge (which is amply supported by the evidence) rendered admissible Mrs. Ford's testimony not only as to the kidnaping but also as to the circumstances leading up to and surrounding the shooting of Officer Stahl, as the crime of kidnaping was still being committed when the shooting occurred. Aside from the strained relationship of Mr. and Mrs. Ford, and her prior conduct, the prosecution's most direct evidence on the issue of Mrs. Ford's lack of consent to accompany her husband and children away from Atkins' house was the testimony of several prosecution witnesses that when defendant told his wife to bring the children and get in the car he had a gun in his hand. The record does not show that defendant uttered any more specific verbal threats at that time as to what would happen if she refused to accompany him; it does show however such testimony by Mrs. Ford as, "He never threatened me, but the gun in front of me, I'd call that a threat." There was also, as has been mentioned, the evidence as to Mrs. Ford's infidelity and her preference for Atkins. Notwithstanding that there was some plausibility in defendant's explanation that he carried the gun for the purpose of defending himself if necessary against Atkins (it is to be remembered that the evidence was undisputed that Atkins had shot at defendant the previous time they met), the jury could properly, and we must presume that they did, conclude that defendant also used the gun to compel his wife to accompany him and their children away from the house of her preferred adulterer. Because of this prima facie violation of the "simple kidnaping" statute (Pen. Code, § 207) the prosecution was able to introduce apparently damaging testimony of defendant's wife.

When analyzed, we find that her testimony on direct examination was generally similar to that of Roope. One amplifi-

cation offered was that when defendant spoke to her after stopping beyond San Luis Obispo "he said, 'Emma Ann, there is no man could love a woman like I do you' and I told him, 'I know it,' and then after that he said to me, he said, 'you know, you are going to die tonight,' and I said, 'yes, I know it.'" Mrs. Ford also testified that after her husband and Officer Stahl scuffled and broke apart, defendant "fired one shot, but he missed him." She then described defendant's firing of the two final shots at Stahl, and added that after kicking him defendant allegedly said, "that will be the end of you, you mother-fucker."

Evaluation of a cold record is at best a difficult undertaking for an appellate court, but here it seems that cross-examination of Mrs. Ford was a somewhat arduous process. Insofar as concerns the defense she appears to have been an uncooperative witness; for example, she answered defense counsel's questions relating to the events of June 9 with the set phrase, "not that I can recall of," no less than 37 times in all. Nevertheless the following testimony was developed: Mrs. Ford admitted that at the time she left defendant in the forest "He always professed love" for her, and that he kissed her good-bye. She corroborated Roope's testimony that after leaving Creston defendant drove "At an excessive high rate of speed." When she first saw the bottle of "Triple Jack" in the car it was three-quarters full; he drank from it as he drove, and finished it off somewhere between Pismo Beach and San Luis Obispo. She admitted that he was then "under the influence of intoxication," but denied that he was drunk; she acknowleged, however, that in a statement given to the police shortly after the homicide she had said that after turning around at Pismo Beach "we started back and went to San Luis, and that is when we discovered he was awful drunk." She admitted further that when defendant got out of the car to face Officer Stahl "He staggered around a couple of steps," but she again denied that he was drunk. Yet she acknowledged that in her first statement to the police she had said, "They scuffled a little bit, and Harvey [Stahl] knew he was pretty well drunk so he stepped behind the station wagon and tried to get his own gun out first." Faced with this impeaching testimony, she admitted in response to the court's questioning that "From the result of the scuffling, it kind of looked like" defendant was drunk. Mrs. Ford testified that after ordering Roope and her to move Stahl's body to the side of the road, defendant "just stood back and watched." Once again impeaching testimony was intro-

duced, and she acknowledged that in her first statement to the police she had said, "He tried to help, but couldn't make it." Finally, she testified that as Roope drove the car away after the shooting she turned and saw defendant "Lying on the ground" in the road.

The prosecution conceded, moreover, that nowhere in Mrs. Ford's first statement to the police did she report any such language of defendant as "that will be the end of you, you mother-fucker." In this connection we observe that it appeared in the course of Mrs. Ford's testimony that she has a hearing defect and understands what is said to her at least in a substantial part by lip reading. Thus at one point the district attorney told defense counsel, "Mrs. Ford, as you can see, is a little bit hard of hearing. If you would hold your face up, Mr. Seitz, she is a lip reader, you will not have to shout so loud." She admitted that on the day of the homicide she had "the same hearing difficulty" as at the trial; in particular, she testified that after defendant stopped the car while leaving Atkins' house and denied having shot Hardy, she "heard" a remark of Mr. Hern "By the motions and lip reading," as the latter "was looking right at us." In the premises we may well doubt this witness' further testimony that she "heard" the above quoted inflammatory words of defendant even though at the time he allegedly spoke them he was looking not in her direction but down at the fallen body of Stahl.

Other than defendant himself the principal witness for the defense was Dr. John L. Carleton, the psychiatrist appointed by the court to examine defendant, determine his mental condition at the time of the alleged crimes, and make a recommendation as to the proper plea. Dr. Carleton testified at length concerning defendant's personal history.[9] Analyzing

---

[9] Relevant matters included the following: defendant was the second youngest of eight children; his father had personality problems, was accused at one time of having incestual relations with one of defendant's sisters, and was sadistic and brutal in punishing defendant; defendant frequently hurt himself intentionally to avoid having to go to school, where he was ridiculed by his classmates; at 13 or 14 years of age he was placed in a boys' home and remained there for an unspecified period, then at a school (character not specifically disclosed), until he was 17, although he ran away a few times; some time after his marriage to Emma defendant began drinking; while in jail on the prior bad check charge his wife either threatened to leave him or filed for divorce, and defendant underwent a severe depressive reaction. Dr. Carleton concluded that as a result of defendant's personal and emotional background he has suffered a continuing need for a stable, affectionate family relationship.

defendant's personality structure, Dr. Carleton testified that "he has characteristics which we would call hysterical. That he has had severe emotional trauma and that his emotional development is very poor. His emotional development or his emotional maturity would be at the childhood level — no more than a four or five year old child.

"Q. [Counsel for defendant]: Doctor, these hysterical tendencies that he has, ... would these things combined make reactions for instance, if you will, where his wife might be going out with some other person, more severe on him than on the average person?

"A. He would be less able to handle them — more or less unable to control his reactions to that particular situation.

"Q. And based upon these facts which you just testified to, taking into consideration your own examination, the history, your own observations, are you able to determine with reasonable medical certainty what the mental status of the Defendant was at the time of the use of the gun on June the 9th? ...

"A. I believe so, yes.

"Q. And in your opinion, what would that be?

"A. I believe Mr. Ford was suffering an amnestic state and that his sub-conscious or unconscious mind had taken over the control of his actions and behavior at that particular time, amnestic state is a hysterical phenomenon. It is a kind of splitting off of the conscious mind so that it doesn't influence one's behavior. Now, for example, all of us have this kind of situation happen to us to a very minor degree. If we put on the brake of a car, we do it without thinking about what we are doing. We do this unconsciously or automatically. Most everybody who drives very much has had the experience of driving for some distance and recognizing at the end of the distance they have passed a number of miles without being aware of the sights or the terrain as they went through it. If this same kind of condition exists to a severe degree, and amnesia is present or other hysterical reactions occur, such as hysterical paralysis or conversion reactions, then the unconscious mind — the primitive or the instinctual part of every human being — the animal part which lies deep within the human being takes over and the conscious, socially acceptable mind does not influence behavior, and I believe this was his state at the time of these events.

"Q. Were you able to determine what in your opinion were the contributing factors which took him to that mental status or state?

"A. Yes. He shows a history of hysterical behavior all of his life, of trying to get away from difficult situations, of trying to avoid them. His personality is such that this is not an unusual reaction for him to have. He gives a history of four or five similar reactions in the year preceding — directly preceding the events that he is involved in now. He also describes fainting spells which are a kind of hysteri[c]al reaction. Now, in addition to this, Mr. Ford had been eating very poorly for approximately two weeks prior to the events; he had been sleeping outside, his nutrition and general physical condition was [sic] very poor. He was very fatigued. He was under extreme emotional distress in that his wife was living with another individual, another man, and his children were being exposed to this situation and other sexual situations which he disapproved of violently. The other contributing factor was the fact that he had been drinking. It is well known that certain individuals, particularly with certain personality structures, become amnestic after they have been drinking. This is a relatively common thing in certain individuals, after they have consumed alcohol. We know the — we know the amount of alcohol that he had in his blood at the time of the shootings. We know that that amount of alcohol is sufficient to justify the accusation or the decision that he was intoxicated, that it influences — alcohol acts on the brain by acting on the front part of the brain, or the more highly developed parts of the brain, those parts which deal with socially acceptable values, or those parts which store memories of moral values and socially acceptable behavior in the conscious mind first. He was also under the influence of alcohol at the time."

A prosecution witness had established that at the time of a blood test taken some three and one-half hours after the shootings the concentration of alcohol in defendant's bloodstream was 1.7 milligrams per milliliter. Dr. Carleton testified on the basis of this evidence that *at the time of the shootings* the concentration of alcohol in defendant's blood must have been between 2.08 and 2.22 milligrams per milliliter. Dr. Carleton then testified that where there is a concentration of 1 to 2 milligrams per milliliter, alcohol will normally interfere with the functioning of those portions of the brain which control social behavior and reasoning ability.

With respect to the effect of the above related foundational facts on the issue of defendant's capacity to commit first degree murder, the court asked Dr. Carleton to state "what

the condition of this man was at the time relative to his ability to form intent or pre-meditate the act which occurred'' and the doctor answered, ''Well, I don't believe he did, because he didn't have the conscious mind to do so.'' Counsel for defendant then asked, ''That is either to form the intent or to deliberate or premeditate, is that correct?'' Dr. Carleton explained, ''He didn't have the thinking capacity to use judgment and to form an intent at that particular time.''

On cross-examination Dr. Carleton testified that defendant's amnesia was not faked, and that a person in such an emotionally induced amnestic state could still perform the complicated series of acts that defendant performed (e.g., force Roope to cash a check, order a drink, drive a car, etc.). The witness further testified that in view of defendant's amnestic state neither his alleged threats against policemen who might have stopped him, nor his firing more than one shot at Officer Stahl, nor his apparent kicking of Stahl after killing him, was a ''deliberate'' or ''premeditated'' act.

The prosecution's principal rebuttal witness was Dr. Donald S. Patterson, a psychiatrist, who testified that in his opinion defendant's amnesia was faked and that defendant was a sociopath who had the ability to deliberate and premeditate at the time of the homicide. It appeared, however, that this witness examined defendant two days after the shootings (by which time defendant was no longer drunk) and at that time did not have the benefit of Dr. Carleton's computations (or the basis for them) as to the high concentration of alcohol in defendant's blood at the times here material. When presented these figures on cross-examination the witness qualified his direct testimony by saying that in such circumstances defendant ''might still be able to calculate, [but] I don't know about coldly calculate.'' Dr. Patterson conceded, moreover, that an individual with defendant's personality structure ''would be likely to'' react more violently to a high alcoholic blood level, and that ''The effect of alcohol on this type of person with or without the food would be even further—be more difficult for him in the sense of his control. In other words, his impulses would be stronger, he would feel more impulsively in his feelings.''

### Contentions Relating to the Nonhomicide Counts

■ On the burglary charge it was the prosecution's theory that defendant broke into Roope's house on the evening of June 2, 1961, and stole the latter's .22-caliber revolver.

Defendant testified, on the contrary, that he had never seen the gun in question until Roope lent it to him on the morning of June 9 for protection against Atkins. In support of its theory the prosecution called to the stand one of two men whom defendant had visited on June 8 at a ranch outside Atascadero. The witness, a Mexican-American named Ramon Zaragosa Larious who spoke no English, testified through an interpreter that on that occasion defendant showed him a gun which looked like the one belonging to Roope. In an effort to impeach this testimony defendant subsequently called John Marquess, who roomed with Larious and was the other man whom defendant visited on June 8. Marquess testified on direct examination for defendant that he did not *see* defendant in possession of any gun on the day in question, and never *heard* defendant mention any gun. Thus, for whatever it was worth, the defendant opened up the subject of interrogation. On cross-examination the district attorney asked, "Mr. Marquess, isn't it a fact that Mr. Zaragoza [Larious] told you that he had seen Mr. Ford with a gun and you told him not to get involved?" Counsel for defendant objected on the ground of hearsay, but the court ruled that the question was proper. After some discussion as to whether or not Marquess remembered any such conversation, the witness answered, "Well, I heard what's his name — the Mexican, say that he had a gun."

The People take the position that the challenged testimony was not hearsay because it was not offered to prove the truth of the matter asserted therein but simply to diminish the credit of defendant's witness (Marquess) by showing bias in the form of an attempt to suppress evidence. (*People* v. *Mack* (1910) 14 Cal.App. 12, 15 [110 P. 967], and cases there cited.) The record does not appear to support this argument; rather it suggests that the subject testimony (if known in advance by the district attorney) was elicited to prove as a fact that *Larious* stated (to Marquess) that he had seen the gun prior to June 9. However, even if we assume that the testimony of Marquess on this point was hearsay, that no other foundation for it was established, that the question was not proper cross-examination, and that the trial court erred in allowing it into evidence over defendant's objection, no prejudicial error appears. (Cal. Const., art. VI, § 4½.) No such prejudice is shown because there was ample evidence other than this to connect defendant with the burglary, and it is not reasonably probable that the jury would have disbe-

lieved Larious' entire testimony if this remark of Marquess had been excluded.

■ Defendant contends that the evidence is legally insufficient to support the finding that the burglary was of the first degree. This point is well taken. Penal Code section 460, subdivision 1, declares that first degree burglary is that which is committed, *inter alia*, either "in the nighttime" or by one who during the course thereof "arms himself with a deadly weapon. ..." As the Attorney General concedes, there was no evidence that the burglary was committed in the nighttime or that Roope's gun was loaded when it was stolen; nor is there any evidence that defendant loaded the gun during the course of the burglary. In *People* v. *Black* (1925) 73 Cal.App. 13, 29 [7] [238 P. 374], it was held that a burglar who steals an unloaded revolver as part of his loot does not "arm" himself with a "deadly weapon," as those terms are used in Penal Code section 460. As none of the other conditions of subdivision 1 of Penal Code section 460 were met in the case at bench, it appears that defendant could not properly have been convicted of more than second degree burglary. Such conclusion, however, does not require reversal of the burglary conviction, for the evidence is ample to establish that the crime of burglary as charged in Count I was committed and that it was defendant who committed it. Accordingly we rectify this error (under Pen. Code, § 1181, subd. 6) by directing that the judgment on Count I be modified to burglary of the second degree, and, as so modified, affirmed, the cause in this respect to be remanded to the trial court with directions to arraign and sentence the defendant in compliance with this ruling. (*People* v. *Golembiewski* (1938) 25 Cal.App.2d 115, 118-119 [3] [76 P.2d 717].)

■ Defendant contends that the court erred in failing to give on its own motion an instruction that conviction of the crime of robbery required proof of a specific intent to steal, i.e., to permanently deprive an owner of his property (CALJIC No. 72-B; see *People* v. *Spencer* (1963) *ante*, pp. 63, 85 [17a] [31 Cal.Rptr. 782, 383 P.2d 134]). While the jury were instructed as to the *acts* necessary to commit this offense (as set forth in Pen. Code, § 211), defendant did not offer and the court did not give a further instruction defining the required concomitant *intent*. The importance of giving the latter instruction, however, was emphasized in *People* v. *Sanchez* (1950) 35 Cal.2d 522, 526 [1]-528 [3] [219 P.2d 9], where we also restated the principle that it is the

trial court's duty "to see to it that the jury are adequately informed on the law governing all elements of the case submitted to them to an extent necessary to enable them to perform their function in conformity to the applicable law." (See also *People* v. *Bevins* (1960) 54 Cal.2d 71, 77 [5, 6] [4 Cal.Rptr. 504, 351 P.2d 776]; *People* v. *Baker* (1954) 42 Cal.2d 550, 576 [20] [268 P.2d 705].) As one of the essential elements of robbery is a specific intent to steal (see, e.g., *People* v. *Morlock* (1956) 46 Cal.2d 141, 146 [5] [292 P.2d 879]; *People* v. *Rosen* (1938) 11 Cal.2d 147, 149 [1]-152 [3] [78 P.2d 727, 116 A.L.R.991]), it follows that it was the trial court's duty in the case at bench to so instruct the jury even without a request therefor by defendant. (Accord, *People* v. *Stone* (1963) 213 Cal.App.2d 260, 263 [1] [28 Cal. Rptr. 522]; *People* v. *Seay* (1960) 179 Cal.App.2d 362, 363 [1] [3 Cal.Rptr. 769]; *People* v. *Butcher* (1959) 174 Cal. App.2d 722, 731 [11] [345 P.2d 127]; a statement to the contrary in *People* v. *Borbon* (1956) 146 Cal.App.2d 315, 320-321 [5] [303 P.2d 560], is disapproved.) The error, however, was not prejudicial here (Cal. Const., art. VI, § 4½, for Roope's testimony as to the circumstances of the robbery, believed by the jury, permits of no other interpretation than that defendant entertained a specific intent to steal when he demanded Roope's money at gunpoint. (*People* v. *Stone* (1963) *supra,* 213 Cal.App.2d 260, 264 [2], and cases there cited.)

Defendant's remaining contentions on the nonhomicide counts have been examined and are so devoid of merit as to require no particular discussion. For example, he contends that in a number of instances instructions that were otherwise admittedly correct were given in such a sequence as to mislead or confuse the jury; but a reading of all the instructions demonstrates that no such confusion was reasonably possible. Defendant complains that during trial the court made several erroneous recapitulations of the testimony of witnesses, thereby assertedly taking issues of fact away from the jury; but the record shows that such remarks were either proper or, if inaccurrate, cannot reasonably have had the effect now urged. Defendant complains of the court's disposition of certain pretrial matters,[10] but each was proper-

---

[10]I.e., demand for daily transcript of jury selection proceedings; demand for access to statement of individual whom the prosecution did not intend to call as a witness; motion to rescind order of court directing that results of electroencephalographic tests taken at county's

ly within the court's discretion and no abuse thereof appears.

Finally, defendant points out that as to each of the nonhomicide counts the judgment includes the following recital: "with prior convictions *charged* and proved or admitted as follows: as found in Count II. Defendant *was charged* and admitted being, or was found to have been armed with a deadly weapon at the time of commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code section [s] 969c and 3024." (Italics added.) Before a defendant can properly be sentenced to suffer the increased penalties flowing from either such finding (e.g., Pen. Code, §§ 3024, 12022) the fact of the prior conviction or that the defendant was thus armed must be charged in the accusatory pleading, and if the defendant pleads not guilty thereto the charge must be proved and the truth of the allegation determined by the jury, or by the court if a jury is waived. (Charge of prior conviction: Pen. Code, §§ 3024, subd. (e); 969; 1158; *People* v. *Britton* (1936) 6 Cal.2d 1, 4 [2] [56 P.2d 494]; *In re Harris* (1947) 80 Cal.App.2d 173, 176 [2] [181 P.2d 433]. Charge of being armed with a deadly weapon: Pen. Code, §§ 3024, subd. (e); 969c; 1158a; *People* v. *Calloway* (1954) 127 Cal.App.2d 504, 509-510 [6] [274 P.2d 497].) Here, however, a perusal of the information discloses that no such prior conviction was in fact charged in Counts I, III, IV, V, or VI, and that no allegation that defendant was thus armed was in fact made in Counts I, III, IV, or VI; moreover, although defendant at no time waived a jury trial these findings were made not by the jury but by the court (after denial of the motion for new trial, and out of the presence of the defendant). It follows that the subject finding must be stricken insofar as relates to Counts I, III, IV, and VI of the judgment. (*People* v. *Calloway* (1954) *supra,* 127 Cal.App.2d 504, 510 [6].) As to Count II (possession of a concealable weapon by an ex-felon) and Count V (assault with a deadly weapon) this finding must likewise be stricken because the statutorily increased penalties do not apply to these offenses. (*In re Shull* (1944) 23 Cal.2d 745, 749 [2]-752 [4] [146 P.2d 417]; *In re Rodgers* (1932) 121 Cal.App. 370, 371-373 [1] [9 P.2d 223].)

expense be made available to the prosecution; motions for continuances to allow more time for the taking of these and other tests; motion to suspend proceedings pursuant to Penal Code section 1368.

## Contentions Relating to the Murder Count

**Failure to Instruct on Manslaughter.** Defendant first contends that the trial court erred in refusing to give his—or any—instructions on manslaughter. But that refusal was proper because even accepting defendant's version of the facts relating to the homicide, the crime could not, as a matter of law, have been manslaughter. (*People* v. *Carter* (1961) 56 Cal.2d 549, 564 [7a-7b] [15 Cal.Rptr. 645, 364 P.2d 477] ; *People* v. *Zilbauer* (1955) 44 Cal.2d 43, 49 [3] [279 P.2d 534].) **A** homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes at least second degree murder. (*People* v. *Poindexter* (1958) 51 Cal.2d 142, 149 [5, 6] [330 P.2d 763] [administering narcotics to a minor] ; *People* v. *Powell* (1949) 34 Cal.2d 196, 205 [7] [208 P.2d 974] [abortion] ; cf. *People* v. *McIntyre* (1931) 213 Cal.50, 56 [4] [1 P.2d 443] [drunk driving].) **The** evidence other than that related to the murder count amply suports the judgments of conviction of the felonies of kidnaping Roope and Mrs. Ford (Pen. Code, § 207) and of possession of a concealable weapon by an ex-felon (Pen. Code, § 12021, here determined to be a felony as defendant was sentenced therefor to state prison for the term provided by law). These latter crimes are by their nature continuing ones, and were still in the process of being committed when the killing of Officer Stahl took place. They are inherently dangerous to human life, and "the killing had a direct causal relationship to the crime[s] being committed" (*People* v. *Robillard* (1960) 55 Cal.2d 88, 98 [9] [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]). It follows that under the rule just stated the homicide in the case at bench was, as a matter of law, at least murder in the second degree.[11] (*People* v. *Carter* (1961) *supra,* 56 Cal.2d 549, [7b] [kidnaping] ; *People* v. *Robillard* (1960) *supra,* 55 Cal.2d 88, 98 [9] [violation of Pen. Code, § 12021].)

**Erroneous Instructions on Intoxication.** Defendant contends that the instructions given on the subject of in-

---

[11]It does not follow, of course, that the subject homicide was any *more* than second degree murder. While there is enough evidence in the record of premeditation and deliberation — when viewed favorable to the People — to preclude us from reducing the crime to second degree murder on this appeal, that evidence is such that if the jury had been properly instructed on the issue of intoxication (see next point in text) their verdict conceivably might have been for the lesser degree.

toxication were prejudicially erroneous. The point is well taken. The court first gave an instruction[12] materially identical with CALJIC No. 78. As we recently observed in *People* v. *Spencer* (1963) *supra, ante*, pp. 63, 85 [17a], the giving of such an instruction "could well leave a jury in a state of confusion or even with the impression that as a matter of law a defendant's voluntary intoxication can have no effect on the criminality of his conduct. The subject instruction is intended to be, and should be used only where the crime charged does not require specific intent." In the circumstances of this case proof of a "wilful, deliberate and premeditated" intent to kill was essential to support a conviction of first degree murder (Pen. Code, § 189). It was therefore error to give the subject instruction, and for the same reason it was error to give a further instruction phrased in terms of former CALJIC No. 319.[13]

---

[12] "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.

"However, if you find that prior to the killing of David Harvey Stahl that the defendant voluntarily resorted to the use of intoxicants then the law does not permit him to use his own vice as a shelter against the normal, legal consequences of his conduct."

[13] "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act.

"The rule of law is that when a person in a state of intoxication, voluntarily produced by himself, commits a crime, he shall not be permitted to use his own vice as a shelter against the normal legal consequences of his conduct. (Even temporary insanity caused by intoxication does not destroy responsibility if the person, when sane and responsible, voluntarily brought on the intoxication.)

"Hence voluntary intoxication, although evidence of such may throw light on an occurrence and aid in determining what took place, is not of itself either an excuse for the commission of crime or a defense to a charge of crime. But if and when the proof shows that the defendant unlawfully killed a human being, and if the evidence also shows that at the time of the mortal assault the defendant was intoxicated, or, in common language, that he was drunk, the jury is permitted and ought to consider such evidence of drunkenness, but for one purpose, namely, in determining the degree of the crime. The weight to be given that

The People concede that the court erred in giving the foregoing two instructions on intoxication, but assert that no prejudice ensued. The record does not support this assertion. The People first restate their theory that the homicide was in any event murder in the second degree because it was committed in the perpetration of a felony; but that argument is obviously of no relevance where, as here, the homicide has been found to be first degree rather than second degree murder. The People also urge that even under the erroneous instruction given (former CALJIC No. 319, *ante*, fn. 13) the jury "understood" that "intoxication could affect the degree of the crime," and hence that their rejection of a second degree murder verdict constituted an implied finding that defendant had the mental capacity to commit first degree murder. But the instruction that intoxication could affect the degree of the crime was in effect negated by the court's further statement to the jury — repeated in each of the erroneous instructions — that no act is "less criminal" by reason of being committed while the defendant is in a state of voluntary intoxication and that a person in such a condition is not permitted to use his own vice as a shelter against "the normal, legal consequences" of his conduct (*ante*, fns. 12 and 13). Finally, the People imply that in the case at bench intoxication should as a matter of law be no defense to the murder charge because defendant's statement that he needed the liquor "to get his courage up" assertedly demonstrated that before he began drinking he had already formed the intent to kill. It is true that on this record, under proper instructions, the jury could have so found; but under such instructions the jury could also have believed that defendant needed "to get his courage up" for the wholly different purpose of reclaiming his wife and children from the presence of a man (Atkins) who had previously threatened his life and had even fired a shot at him while defendant was unarmed. The choice between such inferences (or possibly among others) was for the jury to make, under proper instructions.

As distinguished from *People* v. *Spencer* (1963) *supra, ante,* pp. 63, 86 [18]-87 [19], here the evidence of defendant's intoxication was ample to require the giving of correct instructions on the subject. Without repeating the testimony

evidence is a matter for the jury to decide in connection with its consideration of all other evidence pertinent to the question of degree of the offense."

in detail, it is enough to refer at this point to the uncontradicted evidence that defendant, in a state of exhaustion and malnutrition, drank the entire bottle of "Triple Jack" (as well as a beer) in probably less than two hours; that defendant appeared to be unaware that he had shot Hardy; that defendant drove Roope's car in a wild and highly erratic manner, weaving in and out of traffic and driving one stretch on the wrong side of the freeway; that defendant was confused, became lost frequently, and was unable to light a cigarette; that defendant staggered as he got out of the car to face Officer Stahl; that when Roope and Mrs. Ford drove off after the shooting of Stahl, they left defendant lying in the road; that when defendant was arrested some one and a half hours later he was still in the vicinity and was found walking slowly back towards the scene of the homicide, swaying and smelling of alcohol; and that the blood test, taken that afternoon, indicated that at the time of the shootings the concentration of alcohol in defendant's blood was between 2.08 and 2.22 milligrams per milliliter, considerably higher than the average level at which alcohol interferes with the functioning of the brain.

As the issue of intoxication was thus clearly raised by the evidence, it was essential that the jury be correctly instructed regarding the possible effect of that evidence on the state of mind in which defendant did the acts in question and hence as to whether such acts were or were not the product of that specific and deliberately formed and executed intent to kill which constitutes first degree murder. The importance of these instructions is underscored in the record before us by the fact that the jury interrupted their deliberations to request that the court reread the "Section regarding the use of alcohol and its bearing on the degree of the crime." Both of the above discussed erroneous instructions (*ante*, fns. 12 and 13) were then reread in their entirety to the jurors. No other instructions were requested, and the jury returned a verdict of guilty of first degree murder. In these circumstances the court's error in failing to give correct instructions on intoxication, compounded by the repeated giving of inappropriate and misleading instructions on the same subject, was prejudicial. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 835 [12] - 838 [13] [299 P.2d 243]; see also *People* v. *Baker* (1954) *supra*, 42 Cal.2d 550, 571 [15] - 577 [21]; *People* v. *Sanchez* (1950) *supra*, 35 Cal.2d 522, 526 [1] - 529 [4].) As distinguished from the latter two cases, however, here the error affected only the question of the de-

gree of the murder. There was no evidence that defendant was intoxicated at the time he committed burglary or robbed Roope; indeed, Dr. Carleton testified that defendant "could have [had] the intent to commit [the robbery] . . . he was capable of thinking and reasoning; I don't believe he was amnestic at that time. . . ." And the remaining crimes of which defendant was convicted do not require any showing of specific intent.

 *Failure to Give a Cautionary Instruction on Defendant's Oral Admissions.* It is contended that the court committed prejudicial error in failing to give on its own motion a cautionary instruction concerning the alleged oral admissions of defendant. The contention is meritorious. Section 2061 of the Code of Civil Procedure declares in relevant part that the jury "are . . . to be instructed by the court on all proper occasions: . . . 4. That . . . the evidence of the oral admissions of a party [ought to be viewed] with caution."

 Such an instruction, when called for by the evidence, must be given even without a request therefor. (*People* v. *Deloney* (1953) 41 Cal.2d 832, 840 [5,6] [264 P.2d 532], and cases there cited; cf. *People* v. *Terry* (1962) 57 Cal.2d 538, 564 [24] [21 Cal.Rptr. 185, 370 P.2d 985].)

 The People concede that the trial court erred in failing to give this cautionary instruction, but argue that the error was not prejudicial. The record does not support this assertion. An admission is "any statement by an accused relative to the offense charged" (*People* v. *Atchley* (1959) 53 Cal.2d 160, 170 [6] [346 P.2d 764]). As set forth hereinabove several witnesses testified to oral statements allegedly made by defendant during the course of events on June 9. Roope testified that on the way to Creston defendant said he wanted the bottle of liquor because he "needed the drink to get up his courage," and that defendant later fired the gun out of the car window because he "wanted to see how it shot." Both Roope and Mrs. Ford testified that on passing two parked police cars on the freeway defendant said, "they'd better not give me any trouble or they are going to lose"; that as they passed Stahl's car parked on the road defendant said, "he'd better not give me any trouble because he is going to lose"; that as defendant got out of the car to face Stahl he said, "that son-of-a-bitch had better not give me any trouble"; and that after firing the fatal shot defendant made a kicking motion and said, "that will be the end of you, you mother-fucker". These statements bore directly on the issue of

defendant's capacity to deliberate and premeditate sufficiently to commit first degree murder. They constituted a substantial part of the evidence offered to establish the prosecution's theory that the shooting of Stahl was deliberate and premeditated because defendant had formed an intent to kill any police officer who might interfere with his plans. Yet each such statement was reported by hostile witnesses whose testimony showed a number of obvious conflicts and apparent inconsistencies. As we observed in *People* v. *Bemis* (1949) 33 Cal.2d 395, 398-399 [2] [202 P.2d 82], "The dangers inherent in the use of such evidence [of alleged oral admissions of the defendant] are well recognized by courts and text writers. [Citations.] 'It is a familiar rule that verbal admissions should be received with *caution* and subjected to careful scrutiny, as no class of evidence is more subject to error or abuse. Witnesses having the best motives are generally unable to state the exact language of an admission, and are liable, by the omission or the changing of words, to convey a false impression of the language used. No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury, as it is often impossible to contradict their testimony at all, or at least by any other witness than the party himself.' (2 Jones, Commentaries on the Law of Evidence, 620.) "

Here, as in *People* v. *Deloney* (1953) *supra,* 41 Cal.2d 832, 840 [6], "Defendant's admissions were vitally important evidence in this case; it was likewise vitally important that the jury be guided as to the manner in which it was to view that evidence." In this state of the record the error of the trial court in failing to discharge its statutorily declared duty to give a cautionary instruction could well have tended to prejudice defendant. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) *supra,* 46 Cal.2d 818, 835 [12] - 838 [13]; see also *People* v. *Deloney* (1953) *supra,* 41 Cal.2d 832, 840 [5, 6], 843-844 [12]; *People* v. *Bemis* (1949) *supra,* 33 Cal.2d 395, 398 [2] - 401 [3b].)

Since the judgment on the murder count is to be reversed, certain other contentions of defendant will be noticed for purposes of retrial. (Code Civ. Proc., § 53.)

Defendant contends that the district attorney committed prejudicial misconduct in his statements and arguments to the jury by making repeated assertions of fact which were unsupported by the evidence. At least some of these misstatements may be excused as trivial inaccuracies or

exaggerations spoken in the heat of trial. As to most, moreover, defendant neither objected nor requested a correction and an admonitory instruction; in the one or two instances when he did so, the court complied. And the jury were repeatedly admonished, both during trial and in the formal instructions, that statements of counsel (other than stipulations of fact) were not to be considered as evidence in the case. In these circumstances no prejudicial error appears, and we need not consider at this time defendant's charge that the subject misconduct showed bad faith on the part of the prosecutor.

 Defendant contends that the court abused its discretion in receiving into evidence six photographs of the body of the victim at the scene of the shooting. It is urged that the photographs are gruesome and inflammatory, and that as they are "essentially identical" no more than one should have been admitted in any event. In the circumstances we need neither view these photographs nor determine whether their admission was prejudicial, for it appears on the face of the record that the trial court prima facie abused its discretion as a matter of law in failing to *weigh* the probative value of the photographs in resolving a material issue as against the danger of prejudice to the defendant through needless arousal of the passions of the jurors. (*People* v. *Ditson* (1962) 57 Cal. 2d 415, 446 [20] [20 Cal.Rptr. 165, 369 P.2d 714]; *People* v. *Carter* (1957) 48 Cal.2d 737, 751 [11] [312 P.2d 665].) Misapprehension of the law in this respect appears to be indicated by rulings on several of the challenged photographs: As to one (Ex. 23) the court recognized that "it might tend to be prejudicial" but nevertheless ruled that "as long as it is material and shows the deceased after the incident, *it is material and will go in on that basis*"; as to another (Ex. 24) the court reiterated, "Different angle, it is material; *as long as it is material it can go in.*" (Italics added.) If these photographs are offered on retrial it will be the duty of the court to determine their admissibility in accordance with the above stated rule of law, and to make the fact apparent in the record.

Defendant's remaining contentions relating to the murder count need not be specifically discussed; several deal with points not likely to recur on retrial, and the rest are either trivial or without merit.

For the reasons hereinabove stated we rule:

1. The judgment on each of Counts I, II, III, IV, V, and

VI, is modified by striking therefrom the following language: ''with prior convictions charged and proved or admitted as follows: as found in Count II. Defendant was charged and admitted being, or was found to have been armed with a deadly weapon at the time of commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code section[s] 969c and 3024.''

2. As modified in the preceding paragraph, the judgments on Counts II, III, IV, V, and VI, are affirmed.

3. The judgment on Count I is further modified to burglary of the second degree, and, as thus modified, is affirmed.

4. The cause as to each count other than Count VII is remanded to the trial court with directions to arraign and sentence the defendant in compliance with the foregoing rulings.

5. The judgment on Count VII is reversed and the cause remanded for a new trial.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.

Appellant's petition for a rehearing was denied March 4, 1964.